## Case No. 10,946.

### The PENNSYLVANIA.

[3 Ben. 215.] [1]

District Court, S. D. New York. April, 1869.

COLLISION IN NEW YORK HARBOR—VESSEL IN TOW AND STEAMSHIP—FAILURE TO KEEP COURSE.

1. Boats in tow, and exclusively under the control of a steam-tug, are, as respects other vessels, to be considered vessels under steam.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

2. Where a steamboat, having fourteen boats in tow, was coming up the Hudson river on a flood tide, and saw a steamship ahead, and about 2,000 feet off, coming down the river, presenting the bluff of her starboard bow, and blew two whistles as a signal to her to pass to her own left, and received no answer, and soon, seeing that the steamship had ported her helm, the steamboat, without altering her own helm, stopped, and reversed her engine, the effect of which, in the flood tide, was to cause the rear boats to spread out, so that they were thrown across the course of the steamship, which would otherwise have cleared them, but which struck the rear boat on the port side of the tow: *Held*, that if the steamship was seen directly ahead of the steamboat, and presenting the bluff of her starboard bow, as claimed by the steamboat, the vessels would have passed clear, if both had kept on, and that article 14 of the rules for avoiding collisions was, therefore, on that theory, not applicable to the case.

3. If it were, it was also the duty of the steamboat, under article 18, to keep her course, and, having allowed her tow to spread out across the track of the steamship, she did not, in the sense of the statute, keep her course, and was negligent in so doing.

4. The spreading out of the tow by the tide, was a necessary effect of her stopping, and was a special circumstance requiring a departure from article 16, if that article would otherwise have been applicable.

5. Under article 20, the steamboat was liable for neglecting the precaution of keeping on without stopping.

6. The steamship, having made the tow a little on her port bow, and having ported her helm, and having slackened her speed, and stopped and backed as soon as she saw, by the stopping of the steamboat, and the spreading out of her tow, that there was risk of collision, was not in fault.

In admiralty.

James Ridgway, Max Goepp, Julius Bissell, and Francis C. Bowman, for libellants.

John Chetwood and Charles Donohue, for claimants.

BLATCHFORD, District Judge. These are five libels filed to recover the damages caused by a collision, which took place in the harbor of New York, in the Hudson river, off the foot of Courtlandt street, in the city of New York, on the morning of the 24th of October, 1867, just before sunrise, between the steamship Pennsylvania, which had left her dock, in said city, and was bound on a voyage to sea, and three boats, called "chunkers," loaded with coal, and in tow of the steamer Princeton. The Princeton was on her way up the Hudson river, having come from Amboy, New Jersey, with fourteen boats in tow, two being on each side of her, one directly behind each of those four, and six more in a third tier behind the second four, such six being arranged so that three of them were on the left, in the second tier behind the two on the port side of the Princeton, and three of them were on the right, in the second tier behind the two on the starboard side of the Princeton, with an interval between the port three and the starboard three. These suits relate to the port three, and their cargoes, which were damaged by the collision. The Pennsylvania struck the extreme port boat of such port three.

The case on the part of the libellants is, that the Princeton saw the Pennsylvania ahead, about 2,000 feet off, presenting to the Princeton the bluff of her starboard bow; that the Princeton, when the Pennsylvania was at that distance off, blew two blasts of her steam whistle, as a signal to the Pennsylvania to pass to her own left, or between the Princeton and the New York shore; that the Princeton, receiving no answer to her whistle, and observing, when the Pennsylvania was about fifteen hundred feet distant, that the Pennsylvania had ported her helm, and was coming straight towards the Princeton, so as to involve risk of collision, stopped and reversed her engine, and did not alter her helm; that the checking of her headway caused the port three boats, in her hindmost tier, to spread out more to port, by means of the tide, which was flood, while she and her tow were being swept up the river by such tide; and that the Pennsylvania passed in safety to the westward of the two boats on the port side of the Princeton, and of the boats in the first tier behind, but struck the port side of the extreme port boat of the hindmost tier. The libellants claim, in the first place, that this case is to be governed by the regulations prescribed by article 14 of the steering and sailing rules contained in the act of April 29th, 1864 (13 Stat. 50); and that, as the two steamers were, when the Princeton first saw the Pennsylvania, crossing, so as to involve risk of collision, and as the Pennsylvania then had the Princeton on her own starboard side, it was the duty of the Pennsylvania to keep out of the way of the Princeton and her tow. The answer to this is, that the two vessels were not crossing so as to involve risk of collision, because it is expressly contended by the Princeton, and the fact is so, that if the Pennsylvania was in the position alleged by the Princeton, directly ahead of the Princeton, and 2,000 feet off, and presented the bluff of her starboard bow to the Princeton, the two vessels, if both of them had kept on their respective courses, would have passed clear of each other. Besides, if it was the duty of the Pennsylvania, by article 14, to keep out of the way of the Princeton and her tow, it was also the duty of the Princeton, by article 18, to keep her course. I am satisfied that this collision happened entirely from the fault of the Princeton in stopping where she did, and suffering her boats to spread out by the force of the tide. That was gross negligence. But for that, the Pennsylvania would have passed the hindmost tier in safety, as she did the rest of the boats. The boats in tow are to be considered as boats under steam, because towed by, and exclusively under the control of, the tug. The Princeton, in suffering the tows to spread out, and change their course, and lie, as Riley, one of the

hands on the Princeton, and one of the witnesses for the libellants, expresses it, right across the track, did not. in the sense of the statute, keep her course. She should, at least, have refrained from this manœuvre, with a flood tide, which she must have known would produce the very effect it did. She had no power, by whistling, to compel the Pennsylvania to pass to the eastward. Even if she was not obliged, in compliance with article 13, to put her helm to port, when she saw that the Pennsylvania had ported, and was meeting her end on, so as to involve risk of collision, yet she had no right, in reliance on article 16, under the circumstances, to stop and reverse. By article 19, in construing the rules, due regard must be had to special circumstances which exist, in any particular case, rendering a departure from any rules necessary, in order to avoid immediate danger; and, by article 20, nothing in the rules is to exonerate a vessel from the consequences of the neglect of any precaution required by the ordinary practice of seamen, or by the special circumstances of the case. In this case, an adherence to rule 16, by stopping and reversing, on the part of the Princeton, was sure to bring with it, in the flood tide, immediate danger, by spreading out the tow across the track of the Pennsylvania, and a departure from that rule was necessary to avoid such danger; and the collision was the plain consequence of the neglect by the Princeton of the precaution, which the special circumstances of the case, and the ordinary practice of every intelligent seaman required, of not stopping and reversing, when going with the tide, and thus suffering the boats in tow to spread out, and get into the way of the Pennsylvania.

I see no fault on the part of the Pennsylvania. She slackened her speed, and stopped, and reversed, as soon as she perceived, by the stoppage of the Princeton, and the spreading out of her tow, that there was any risk of collision with any part of the tow. She could not have apprehended any such negligent action on the part of the Princeton. The fact that she passed every thing in safety, except these three port tows, which were in the act of being spread out by the tide through a stoppage by the Princeton, which could not have been anticipated, shows that the collision was wholly due to such action of the Princeton. I think, on the evidence, that the Pennsylvania made the Princeton a little on the port bow of the Pennsylvania, and that, from that moment, in accordance with article 13, the Pennsylvania put and kept her helm to port until the collision, and that she would have cleared the Princeton and the whole of her tow, if the Princeton had not negligently thrown her tow, in the manner already stated, across the track of the Pennsylvania. When too late, the Princeton became aware of the danger in which she had involved her tow, and started ahead, with a view of dragging the boats out of the way of the Pennsylvania, but there was not time to effect the object.

The libels must be dismissed, with costs.