## Case No. 7,319.

### The J. H. GAUTIER.
### The HERBERT MANTON.

[5 Ben. 469;[1] 11 Am. Law Reg. (N. S.) 769; 5 Am. Law T. Rep. 87; 15 Int. Rev. Rec. 39.]

District Court, S. D. New York. Jan., 1872.[2]

T. Scudder and R. D. Benedict, for libellants.

W. R. Beebe and C. Donohue, for the tug.

E. H. Owen and E. L. Owen, for the schooner.

BLATCHFORD, District Judge. These two suits are tried together. The libellants in the first suit, as owners of the canal-boat Gettysburg, and the libellants in the second suit, as owners of the cargo of coal laden on board of said canal-boat, bring these suits, each of them against the steam-tug J. H. Gautier and the schooner Herbert Manton, to recover damages for the total

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 6,399.]

loss of the canal-boat and her cargo, through a collision which occurred between the canal-boat and the schooner, on the 28th of November, 1871, between nine and ten o'clock a. m., off the steamboat wharf at Astoria, Long Island, a short distance above the upper end of Blackwell's Island. The canal-boat was at the time in tow of the steamtug, being lashed to the port side of the steamtug. The tug and canal-boat had come from Twenty-Third street. New York, and were bound for the steamboat dock at Astoria, where the cargo of coal was to be discharged. They had gone up the channel between Blackwell's Island and Manhattan Island. This required the tug, after reaching a point sufficiently far above the upper end of Blackwell's Island for safety, to swing around to starboard by porting, so as to head across the channel she had come up, and across the upper end of Blackwell's Island, and across the channel between Blackwell's Island and Long Island, to reach the dock at Astoria, and so as to present the port side of the canal-boat to vessels proceeding through Hell Gate around Hallett's Point to New York. The tide was the last of the flood. The schooner went through Hell Gate from the eastward, rounded Hallett's Point, and was proceeding on, with a view to enter the channel between Blackwell's Island and Long Island, when she came into collision, stem on, with the port side of the canal-boat, and the canal-boat and her cargo were totally lost.

The libels allege, that the collision was caused by the carelessness and negligence of those in charge of the tug and schooner; that the tug was negligent in turning in to the dock ahead of the schooner, instead of allowing the schooner to pass clear between the tug and the dock, "as she would otherwise have done;" and that the schooner was negligent, in not keeping a proper lookout, in not sheering out to avoid the canal-boat, as she could have done, "and in changing her course back again after she had undertaken to pass outside."

The answers of the tug allege, that the wind was free for the schooner; that, upon nearing Astoria, the tug and her tow headed in towards the dock to which she was bound, heading nearly or quite across the river, and, as she neared the dock, gradually turning her head towards New York, so as to bring the canal-boat next to the dock, and the head of all to the tide; that, while the tug and her tow were thus approaching the dock, and when they were a very short distance from it, and heading on it, the schooner was coming down through Hell Gate, bound to New York, having the wind free and a full-sail breeze, with the whole river to the New York shore side free for her navigation; that, as the schooner came on towards the tow, she ported, so as to throw her head off shore, and her course

outside of the tug and canal-boat, and then suddenly kept away, as if to endeavor to force herself between the tow and the dock, from which the tow was then but a few feet distant, the tow being then turning its course towards New York, and at a time when it was impossible for the tug to avoid the schooner; that a warning signal was given, but the schooner kept on, and struck the canal-boat on the port side a glancing blow, both vessels at the time heading the same way substantially; and that, at the time of the collision, both the tow and the schooner were so near the dock that the schooner came up along the end of the dock, the canal-boat, at the time of the blow, being about the width of the schooner from the dock.

The answers of the schooner allege, that the collision was caused solely by the fault of the tug and the canal-boat, in turning in to the dock, and in crossing the bows of the schooner in order to reach the same, in not stopping and allowing the schooner to pass along, and in not sheering off and passing under the stern of the schooner, either of which movements could have been made without difficulty; that the schooner had a competent lookout, properly stationed; that she was lawfully prosecuting her voyage when the tug and the tow approached; that she kept steadily on her course, as she was by law entitled to do, and did not change the same; and that the tug and the tow attempted improperly to cross her bows, and so threw themselves under her, and thereby received the injuries complained of.

There is no good reason why the court should not apply to this case the rule prescribed by article 15 of the steering and sailing rules in the act of April 29, 1864 (13 U. S. Stat. 60), which is, that "if two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship," and the further rule prescribed by article 18, that where, by article 15, "one of two ships is to keep out of the way, the other shall keep her course, subject to the qualifications contained" in article 19. It is manifest that negligence caused this collision, that the canal-boat was without fault, and that either the tug or the schooner or both of them, were in fault. As respects the schooner and her duty towards the tug and her tow, lashed as the tow was to the side of the tug, and not towed behind by a hawser, the tug and the tow must be regarded as one vessel, and that a steam vessel. It was the duty of the tug to avoid the schooner, and it was the duty of the schooner to keep her course. The schooner had a right to select, after passing Hallett's Point, a course, in the then state of the tide and the wind, which would be most favorable for the prosecution of her voyage to New York. It is in evidence that such course

was a course, after rounding Hallett's Point, approaching towards the Long Island shore, at an angle, so as to go down through the channel between Blackwell's Island and Long Island. She adopted that course and kept it. Such course would naturally carry her comparatively near to the dock at Astoria, and would cause her, after rounding Hallett's Point, to approach nearer all the time to the Long Island shore. There is no warrant in the evidence for the conclusion that the schooner, at any time after rounding Hallett's Point, ported or turned her head to starboard. The schooner had a right to rely on the rule of navigation, and to suppose that the tug would stop in time, and not attempt to cross the bows of the schooner. But the tug kept on until, seeing there was danger, she blew one whistle and stoped and backed, but at too late a time. The schooner, in the jaws of peril, and to ease her blow against the canal-boat, starboarded, when a collision was inevitable, and but a moment before it occurred, and fell off a little, so that the concurring forward motion of the three vessels and the action of the tide brought them all near to the dock. It is impossible not to see that there was no fault in the schooner, and that the collision was caused by the fault of the tug, in not stopping sooner and going under the stern of the schooner. There was abundant room for her to do this, and no excuse for not doing so.

There must be a decree for the libellants in each suit against the tug, with costs, with a reference to a commissioner to ascertain the damages, and the libel must be dismissed in each suit as to the schooner, with costs.