UPTON v. TRIBLECOCK. See note to Case No. 5,541.

URANN (HARRISON v.). See Case No. 6,146.

URBANA, TOWN OF (LESLIE v.). See Case No. 8,276.

URQUHART (BOYD v.). See Case No. 1,750.

## Case No. 16,803.

### The U. S. GRANT.

[7 Ben. 195.][1]

District Court, S. D. New York. March, 1874.

COLLISION IN NEW YORK BAY—TUG AND TOW—LIGHTS—STEAMER AND SAILING VESSEL.

1. A steamtug, the G., was going up the bay of New York, near the Narrows, at night towing astern on a hawser the brigantine C. They were heading north northwest. The G. had the usual side lights, and a bright light astern, but she did not have two bright lights set vertically, to indicate that she had a vessel in tow. The brig T. was going down the bay, heading

1 [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

about south by west, with the wind about northwest. The lights of the G. were seen from the T. nearly ahead and crossing from port to starboard. The T. kept her course, and did not see the C. till she was but a short distance from the C., when the helm of the T. was starboarded. The helm of the C. was also starboarded, but the T. struck the C. a glancing blow on her starboard quarter. The owners of the C. filed a libel against both the G. and the T., alleging fault in the G. that she did not have the proper lights set, and did not keep the C. clear of the T., and fault in the T. that she was not on her proper course, but was heading too much to the west, and that she kept on her course and ran into the C. The answer of the G. charged fault in the T., that, after passing the G., she changed her course to the westward, and ran into the C., and the answer of the T. charged fault in the G., in not having the proper lights set to indicate that she had a vessel in tow. The C. was in charge of a pilot, who had the direction of both the C. and the G.: *Held*, that the courses of the vessels were crossing courses.

2. The tug and tow were to be treated as a single vessel under steam, and it was their duty to keep out of the way of the T.

[Cited in The Fred W. Chase, 31 Fed. 96.]

3. The T. was not off her proper course, and did not change her course improperly, and was not in fault in not sooner seeing the C.

4. Under the 4th article of the rules for preventing collisions (notwithstanding the 11th section of the act of July 25, 1866 [14 Stat. 228]), the G. was bound to have had two white lights set vertically, to indicate that she had a vessel in tow, and was in fault for not having them; and such fault contributed to the collision.

[Cited in The F. & P. M. No. 2, 36 Fed. 266.]

5. The C. must, as between herself and the T., bear the responsibility of the fault of the G. as to lights.

6. The T. was not in fault, and the C. was not in fault in starboarding.

7. In the absence of directions given to the master of the G. by the pilot on board of the C., the former was bound to keep the C. out of the way of the T., and the G. alone was liable for the damages sustained by the C.

In admiralty.

W. R. Beebe, for libellant.
D. McMahon, for the U. S. Grant.
R. D. Benedict, for the Tally Ho.

BLATCHFORD, District Judge. This libel is filed by the owner of the brigantine Lydia H. Cole against the steamtug U. S. Grant and the brig Tally Ho, to recover for the damages sustained by the libellant through a collision which took place between the Tally Ho and the Cole, on the evening of the 30th of January, 1869, after dark, in the bay of New York, just below the Narrows. The Cole was under bare poles, and was being towed by the Grant astern by a hawser. The Tally Ho was bound down the bay, under sail, going to sea. The Tally Ho struck the Cole a glancing blow on the starboard quarter of the Cole, a few feet forward of the stern of the Cole. There was a strong breeze from about northwest, free for the Tally Ho. The Cole had a pilot on board, who had the direction of the Grant and of the Cole. The Tally Ho had no pilot.

The libel alleges, that the green and red

lights of the Cole were burning brightly; that the Tally Ho was seen by those on board of the Cole, bearing off her starboard bow, and, when the lights of the Tally Ho were discovered, she was broad off the Cole and evidently heading towards her; that the pilot of the Cole hailed to the Tally Ho to starboard, but she kept on until so near that a collision was inevitable, when she suddenly kept away and came into the Cole, striking her, slightly angling towards the stern, on her starboard quarter; that the Grant did not have the proper regulation lights set and burning, in that she did not have two bright mast head lights vertically set and burning, to indicate that she had a vessel in tow; that the Cole was at the time helpless, being in tow of and under the entire control of the Grant; that the collision was the result of the combined negligence of the Grant and the Tally Ho; that the Grant was in fault in not having stopped in time, or in time taken her course so as to avoid the Tally Ho, and in not having the proper lights set to indicate that she had a tow, to wit, two bright mast head lights vertically set and burning; and that the Tally Ho was in fault in not steering a proper course for a vessel bound to sea, down the channel, with the wind free, and in keeping on her course, and not giving way when she found out, or ought to have found out, by proper care, that there was a vessel in tow of the Grant, and when it was impossible for the Grant to avoid her, and in not having, with a proper lookout, if she had had one, discovered the Cole in time to avoid her.

The answer of the Grant sets forth, that she was moving slowly, and could not, with her tow, move from one side to the other easily; that the Grant had set her green and red lights, and a bright light on the stem forward of the cutwater, and a bright white light on a flagstaff aft, which were the only lights at that time used by tugs going in and out of the harbor of New York, and were not in any sense or appearance, the lights of a steamship; that the fact, that the Grant did not have two bright lights vertically set and burning, did not at that time indicate she had not a tow, or contribute to the collision; that, while the Grant was proceeding along near the west bank, and as near thereto as was proper or customary for vessels in like circumstances to go, and on a course about north northwest, with the Cole in her wake, the pilot of the Grant observed the Tally Ho about half a mile off the starboard bow of the Grant, but to the leeward, on a southerly course, bound out; that at that time there was no danger of any collision, nor did the courses of the Grant and of the Tally Ho intersect; that, as soon as the Tally Ho had got about abreast of the Grant, and while some distance off to the leeward of the Grant, the Tally Ho, without any cause, suddenly luffed up and took a rank sheer to the westward, on a course across the

bows of the Cole; that the pilot of the Grant immediately stopped her; that the Tally Ho kept off slightly, so that her direction was towards the starboard side of the Cole, angling to the stern, and appeared to be starboarding her helm; that she might even then have avoided the Cole, if the Cole had not improperly put her helm to starboard, whereby the bow of the Cole was suddenly sheered four points or more to the westward, and her stern correspondingly to the eastward, which movement had a direction in the way of the Tally Ho, and contributed to bringing the two vessels together; that no blame is imputable to the Grant; that the Tally Ho was in fault in not steering a proper course for a vessel bound down the channel to sea with the wind free; and that the Tally Ho was without a pilot, and had no lookout forward, and her direction was such, at the time she took her said sheer, as would have made her run on the west bank, and her officers and crew had been making or were engaged in making, sail.

The answer of the Tally Ho alleges, that the Tally Ho had her regulation lights all properly set and burning brightly, and a competent lookout vigilantly performing his duty; that, while the Tally Ho was heading down the channel on her proper course, it being very dark at the time, those on board of her discovered the lights of a vessel appearing from her lights to be a steamship, and not to have another vessel in tow, heading nearly towards the Tally Ho, but angling across her bows from about south southeast to about north northwest, and passing the Tally Ho in safety, but very near; that, soon after she had so passed the Tally Ho, those on board saw coming out of the darkness a short distance off, on about the same course which the steamer had gone, a vessel without sails and showing no lights and moving against the wind, from which it seemed that she was being towed, and apparently by the said steamer, by a long line which was invisible to those on board the Tally Ho, whereupon the helm of the Tally Ho was put hard a-starboard, and she obeyed her helm and fell off, but not enough to avoid a collision between the towed vessel and the Tally Ho; and that the collision happened without fault on the part of the Tally Ho, but was caused by the steamer's having set the proper lights of a steamship, and not having set the proper lights of a steamship having another vessel in tow, and not having a proper lookout performing his duty, and not going up with her tow on the eastern side instead of the western side of the Tally Ho, in crossing the bows of the Tally Ho to go up the western side of her, in not giving the Tally Ho a sufficiently wide berth, in towing the tow against the Tally Ho, and in not keeping her clear of the Tally Ho, and by the towed vessel's not having a proper lookout in a proper place, vigilantly performing his duty, in not having proper lights properly visible, and in not properly starboarding her helm in time to keep clear of the Tally Ho.

The answer of the Grant is authority for the statement that the Tally Ho was on a southerly course, and the Grant was heading north northwest, when the Tally Ho was first seen by the pilot of the Grant, half a mile off, on the starboard bow of the Grant. The answer of the Tally Ho is authority for the statement, that the Grant, when first discovered from the Tally Ho, was heading nearly towards the Tally Ho, but angling across her bows from about south southeast to about north northwest. These two statements substantially concur. They both of them make the courses of the two vessels intersecting courses, at an angle of two points, or 22½ degrees. The answer of the Grant says, indeed, that the courses of the two vessels did not intersect, but it must intend that such courses did not intersect ahead of the Grant. The Grant and the Tally Ho having passed each other safely, starboard to starboard, the inquiry at once arises, why the Tally Ho and the Cole collided with each other. The Tally Ho's answer sets up that she saw the lights of the Grant; that they appeared to be the lights of a steamship; that they did not indicate a steamship having another vessel in tow; that, after passing the Grant in safety, but very near, the Tally Ho saw coming out of the darkness, a short distance off, on the same course with the Grant, the Cole, without sails, and without lights, and moving against the wind, and, therefore, seemingly in tow by a stern hawser from the Grant; and that the collision was caused, in part, by the fact that the Grant had set the proper lights of a steamship, and did not have set the proper lights of a steamship having another vessel in tow, and, in part, by the want of proper lights, properly visible, on the Cole. The libel alleges fault in the Grant in not having the proper lights to indicate that she had a tow, namely, two bright mast head lights, vertically set and burning. The answer of the Grant alleges that the Grant had set her green and red lights, and a bright light on the stem forward of the cutwater, and a bright white light on a flagstaff aft; that these lights were not, in any sense or appearance, the lights of a steamship; and that the fact that the Grant did not have two bright lights vertically set and burning did not, at that time, indicate that she had not a tow, or contribute to the collision. The libel alleges that the Cole had her green and red lights burning brightly. The answer of the Grant does not allege any want of proper lights on the Cole, or on the Tally Ho. The libel does not allege any want of proper lights on the Tally Ho, while it admits that she had lights. Thus, on the question of lights, both of the other vessels set up a want of proper lights on the Grant as contributing to the collision, while the Tally Ho sets up a want of all lights on the Cole.

It becomes necessary, then, to inquire what lights the Grant ought to have exhibited. The 3d article in the rules established by the act of April 29, 1864 (13 Stat. 59; Rev. St. U. S. § 4233), provides, under the head of "Lights for Steamships," that "all steam vessels," when under way, shall carry the green and red lights and a bright white light at the foremast head. The corresponding article in the rules prescribed by the British order in council of January 9th, 1863, provides that those lights shall be carried by "sea-going steamships." The 4th article in the act of 1864, and in the British rules, is headed "Lights for Steamtugs," and is in these words: "Steamships, when towing other ships, shall carry two bright white mast head lights vertically, in addition to their side lights, so as to distinguish them from other steamships. Each of these mast head lights shall be of the same construction and character as the mast head lights which other steamships are required to carry." The 2d article requires that the lights mentioned in the 3d and 4th articles, and no others, shall be carried in all weathers, between sunset and sunrise. By the 11th section of the act of July 25, 1866 (14 Stat. 228), which was in force when this collision occurred, it is enacted, that "the provision for a foremast head light for steamships," in the act of 1864, "shall not be construed to apply to other than ocean-going steamers and steamers carrying sail." That section then goes on to prescribe lights for river steamers navigating waters flowing into the Gulf of Mexico, and then proceeds: "All coasting steamers, and those navigating bays, lakes, or other inland waters, other than ferry-boats, and those above provided for, shall carry the red and green lights, as prescribed for ocean going steamers, and, in addition thereto, a central range of two white lights, the after light being carried at an elevation of at least fifteen feet above the light at the head of the vessel, the head light to be so constructed as to show a good light through twenty points of the compass, namely, from right ahead to two points abaft the beam on either side of the vessel, and the after light to show all around the horizon." As the Grant was not an ocean-going steamer, in the sense of the act of 1866, and was not a steamer carrying sail, but was a steamtug, without masts or sails, she was relieved, by the act of 1866, from carrying the foremast head light prescribed by the 3d article of the act of 1864. But for the act of 1866, she would, as a steamship, when not towing another vessel, have been obliged to carry the foremast head light and the green and red lights prescribed by the 3d article of the act of 1864. The 4th article of the act of 1864, shows that a steamtug is included, in that act, under the general denomination of a steamship, so as to be subject, whether towing or not towing, to all the regulations prescribed by that act for steamships and steam vessels, in addition to being subject, when tow-

ing, to the exceptional regulation in article 4. Under the act of 1866, the Grant fell within the description of steamers required to carry the central range of two white lights. But that regulation was one for her when not towing. The central range of two white lights took the place, by the act of 1866, in respect to the Grant, of the foremast head light in the 3d article of the act of 1864. But as, under the act of 1864, the two bright white mast head lights, vertically, were to designate a steamtug towing, she, when not towing, being bound to carry the foremast head light, so, even after the act of 1866 was passed, the two bright white mast head lights, vertically, or their equivalents, were to designate a steamtug towing, she, when not towing, being bound to carry the central range of two white lights. Before the act of 1866 made it unnecessary for the Grant to carry a foremast head light, and substituted therefor the central range of two white lights, she could not, merely because she did not have any foremast, in the sense in which a steamer carrying sail has a foremast, allege that she was not bound, when not towing, to carry the foremast head light, in substance and equivalency, or that she was not bound, when towing, to carry the two bright white mast head lights vertically, in substance and equivalency. The substitution, by the act of 1866, for vessels like the Grant, of the central range of two white lights for the foremast head light, was, manifestly, not because they could not, though without masts for sails, substantially comply with the requirement to carry a foremast head light. The intentional omission of the words "sea-going steamships," in the 3d article, and the substitution therefor of the words "all steam vessels," when otherwise re-enacting in the same words the British 3d article, in connection with the designation, in the 4th article, of tugs as steamships, and with the well known fact that such vessels as the Grant, without masts or sails, were, at the time of the passage of the act of 1864, in common use, and called steamtugs, is satisfactory evidence that it was understood, by the act of 1864, that such steam tugs could carry what would be in substance the mast head lights of articles 3 and 4 of that act. What is called, in the act of 1866, "the light at the head of the vessel," and "the head light," is there described as a light to be so constructed as to show a good light through twenty points of the compass, namely, from right ahead to two points abaft the beam on either side of the vessel. This is the same construction as that prescribed for the foremast head light, by the 3d article of the act of 1864, and that same construction is prescribed, by article 4, for each of the two mast head lights which are to be carried vertically by steamtugs towing. Article 4 states that the carrying of the two mast head lights vertically is to distinguish the towing steamtug from other steamships, because other steamships would

carry only one mast head light. Therefore, where, under the act of 1866, a steamtug, not towing, would carry a light at the head of the vessel, and an after light, in a central range, she still was required by the 4th article of the act of 1864, to carry, when towing, two lights at the head of the vessel, and to carry them vertically, that is, one above the other, and to dispense with the after light, but still to carry the green and red lights. The object was that a tow, whether towed astern by a hawser or not, should be indicated to other vessels by the lights on the tug, so that they might give both tug and tow a sufficiently wide berth. Towing is extensively done, and was, when the act of 1864 was passed, in waters away from the ocean, by vessels of the character of the Grant; and whether under the act of 1864, or that of 1866, they were required to carry, when towing, substantially the two vertical lights prescribed by article 4 of the act of 1864, and the green and red lights, and no other lights.

Now, what lights did the Grant carry? Her answer sets up, in substance, that she carried the green and red lights, and the central range of two white lights. These were the lights for her when not towing. They were not the lights for her when towing. Whatever lights she had, she did not have two head lights set vertically one above the other.

For the purposes of the 15th article, which requires a steamship to keep out of the way of a sailing ship, if the two are proceeding in such directions as to involve risk of collision, the Grant and the Cole must, as respects the Tally Ho, be regarded as a single vessel under steam, the motive power of the Cole being, at the choice of the Cole, on board of the Grant, at some distance ahead of the Cole (The Cleadon. 14 Moore, P. C. 92, 97). The Grant and the Cole, as one vessel, and that a steam vessel, were bound, as between either of themselves and the Tally Ho, to keep out of the way of the Tally Ho, if the Tally Ho, on the one hand, and the Grant and the Cole, on the other, were proceeding in such directions as to involve risk of collision, although the Cole was being towed astern of the Grant; and it was the duty of the Tally Ho to keep her course. The Cleadon, supra; The Warrior, L. R. 3 Adm. & Ecc. 553.

The complaint in the libel is not that the Tally Ho did not keep her course, but that she did keep her course. It avers that the Tally Ho was heading towards the Cole, and, though hailed to starboard, kept on until so near as to make a collision inevitable, and that the Tally Ho was in fault in keeping on her course, and not giving way, so as to avoid the Cole. It alleges, however, that such course of the Tally Ho was not a proper course for a vessel bound to sea, down the channel, with the wind free, and that the Tally Ho was in fault in steering such course. The answer of the Grant alleges that the

Tally Ho was on a course which involved no danger of any collision, and suddenly luffed up and took a rank sheer on a course across the bows of the Cole, and thus caused the collision.

The theory developed in the evidence on the part of the Cole, given by Beebe, the Sandy Hook pilot who was on board of her, is, that the Grant and the Cole were proceeding up along the west side of the channel, and as near to the edge of the west bank as it was safe to go with a vessel of the draught of water of the Cole; that they were heading north; that the Tally Ho, when nearly half a mile distant from them, and bearing northeast by north from the Cole, was heading about west southwest, while her true course down should have been about south; that her west southwest course would have carried her upon the west bank, if the collision had not occurred; and that, just before the vessels struck, the Tally Ho starboarded, so that she headed about south southwest at the time of the collision, and struck the Cole a glancing blow. It is not alleged that starboarding was an improper manœuvre on the part of the Tally Ho. On the contrary, it is contended that she should have starboarded sooner, and that thereby the collision would have been avoided. There is nothing in the evidence of Beebe which suggests a sudden luffing or change of course by the Tally Ho in an improper direction. The evidence of Sullivan, a witness for the Grant, who is a pilot, and was a passenger on the Grant, is to the same effect as that of Beebe. But, when we come to the evidence of Bullinger, on the part of the Grant, who was in her pilot house, and piloting her, and responsible for her navigation, we have a different theory put forward. He says that his course was north or north by west; that the Tally Ho, when he first saw her, was heading about south, and was about half a mile off from him, and on a course which would not intersect his course; that, soon after, he saw the Tally Ho luff up towards the stern of the Grant, so as to head southwest or southwest by west; that he hailed her to starboard her helm, and slowed the Grant, thinking that the Tally Ho might cross the towing hawser; that, when he found this could not be done, he started the Grant ahead again, so as to try and pull the Cole away from the Tally Ho; and that he did not change his course after seeing the Tally Ho. I place no reliance on the testimony of McCowen, a witness for the Grant, for reasons apparent on the face of his evidence and more apparent as it was given.

The impression left by the whole evidence is, that the Tally Ho did not change her course, and did not luff up, and was pursuing a proper course down the channel. According to the testimony of the master of the Tally Ho, he was standing by his wheel all the time, and was heading about south by west, and saw the lights of the Grant perhaps a

quarter of a mile off, a little on his port bow, but nearly ahead, and bearing about south, and did not change his wheel from that time till he starboarded on the hail of his lookout to do so, just before the vessels struck. He says the collision took place about half a mile to the eastward of the west bank, and makes the course of the Grant to have been about north northwest. His starboarding, he says, a moment before the collision, swung the Tally Ho probably two points, which would be to south by east. The answer of the Grant says, that the course of the Grant was about north northwest. Beebe says, that just before the collision he starboarded the wheel of the Cole and sheered her to the westward about a point and a half. This makes the Tally Ho and the Cole, before they either of them starboarded, on courses which drew on to each other at least one point, and makes them, when they struck, on courses which drew on to each other about two points and a half. On this view, it is easy to see how the collision occurred, in consistency with the claim of the Tally Ho. My conclusion is, that it is not shown to have occurred through any fault of the Tally Ho in sailing on an improper course or in improperly changing her course.

But there remains the question, whether the Tally Ho might not and ought not to have discovered the Cole soon enough to have avoided her, notwithstanding the duty incumbent on the Grant and the Cole to keep out of the way of the Tally Ho, and the duty of the Tally Ho not to embarrass them by changing her course. And here comes in the question of the lights on the Grant and on the Cole. While the omission to exhibit proper lights may be immaterial, if it be clearly shown that the absence of such lights did not contribute to the collision, yet, if it be shown that a vessel did not exhibit the proper lights, the burden lies on her to show that the failure to comply with the statutory rule was not the cause of, or did not contribute to, the collision. The Fenham, L. R. 3 P. C. 212, 216. The Grant did not exhibit towing lights, and, while the lights she did exhibit indicated to the Tally Ho that she was a steamer, the absence of the towing lights from the Grant might very well assure the Tally Ho that it was only requisite for the Tally Ho and the Grant to clear each other. As respects the Tally Ho, as a sailing vessel encountering the Cole towed by the Grant, the Cole must, as between herself and the Tally Ho, bear the responsibility of the fault of the Grant as to lights. The Tally Ho is not to blame for such fault, and, in so far as such fault caused the Tally Ho to collide with the Cole, it must operate to exonerate the Tally Ho, as respects the Cole. It still remains to consider, whether, although excused so far as a warning came from the lights of the Grant, the Tally Ho ought not to have otherwise become aware of the presence of the Cole, and to have avoided her. It is contended that the Tally Ho ought to have sooner seen the Cole or her lights. As to the lights of the Cole, her green light would be more prominently presented to the Tally Ho than her red light would be likely to be. Jones, a witness for the Cole, says that the Cole had her green and red lights burning. Six other witnesses for the Cole were not examined as against the Tally Ho. Beebe, the pilot of the Cole, says that the Cole had her green and red lights burning brightly. The Cole, without sails up and under bare poles, presented no such appearance as the Tally Ho did, which was under full sail. The Grant must have been interposed to some extent between the Cole and the Tally Ho, and the light or lights of the Cole, if she had them, and if any more than her green light could have been visible to the Tally Ho, were not calculated to indicate to the Tally Ho a vessel other than and different from the Grant, particularly as the Grant showed no towing lights. The Cole herself did not loom up, as a vessel with sails up would. In the foreshortening, the Cole, though towed by a hawser astern of the Grant, would, to the Tally Ho, in the darkness, not be likely to present an appearance distinct from the Grant. As to the lights of the Cole, there is the testimony, before cited, of the master and of the steward of the Tally Ho, that she had none, or presented none visible to them. As to the want of a lookout on the Tally Ho, set up as a reason why the Tally Ho did not see the Cole, there is the evidence, before cited, that the Tally Ho had a lookout, although he is not produced as a witness. According to that evidence he was on the forecastle and did see the Cole, and, as a consequence, ordered the Tally Ho to starboard. But, apart from these considerations, the Tally Ho, having the right of way, was not bound to avoid the Cole, and it was the duty of the Tally Ho to keep her course even if she had seen the lights of the Cole as she did see the lights of the Grant, or even if she had seen the Cole herself. The Cole being in fact in tow, if the Tally Ho, seeing her or her lights, had starboarded at a greater distance off, and then the Grant, in discharge of her obligation to keep out of the way of the Tally Ho, had ported, pulling the Cole after her, and there then had been a collision, the Tally Ho would have been in fault; or if the Tally Ho, at a like distance off, had ported, and then the Grant had starboarded, and a collision had ensued, the Tally Ho would have been in fault.

On the whole case, then, I see no fault in the navigation of the Tally Ho, and the case is reduced to a contest between the Cole and the Grant.

The libel alleges that the Grant was in fault, (1) in not having stopped in time; (2) in not having in time taken her course so as to avoid the Tally Ho; (3) in not having towing lights set. The answer of the Grant al-

leges that the Cole was in fault in starboarding when the Tally Ho starboarded, and thus throwing the stern of the Cole in the way of the Tally Ho.

In the case of The Civilta [Case No. 2,775], where a sailing vessel under sail, in the position of the Tally Ho, collided with a sailing vessel not under sail, towed astern by a hawser by a steamtug, and was sunk thereby, and brought suit against both the tug and her tow, I held, that, although the tow had on board a pilot other than her officers, and the tug was subject to the order of such pilot, yet, in the absence of any special instructions from such pilot to the tug as to what was to be done by the tug to keep out of the way of the approaching vessel, it was the duty of the master of the tug to take care so to navigate the tug and the tow as to avoid a collision between either and the approaching vessel. The Secret, 8 Mitch. Mar. Reg. 116. No good reason is perceived why this duty is not one towards the tow as well as towards the third vessel. In the present case, it is not shown that any directions were given to the Grant by any one on the Cole, as to what the Grant should do in view of the approach of the Tally Ho. This left the Grant to continue to be, as she necessarily was before, the Cole being so far behind, under the control of her own master and officers, as to the movements of her helm and of her motive power. It was the duty of the Grant, under such circumstances, not only to keep out of the way of the Tally Ho, but to keep the Cole out of the way of the Tally Ho. She failed to do so, and shows no sufficient excuse for not having done so. I do not think the starboarding by the Cole in extremis can be imputed to her as a fault by the Grant, even if it was a mistake. It is unnecessary to decide whether the Cole, having allowed herself to be towed by a tug without proper towing lights, can allege such want of proper towing lights as a fault in the tug, in this suit by her against the tug.

The result is, that the libel, as against the Tally Ho must be dismissed, with costs, and that the libellant must have a decree against the Grant, with costs, with a reference to a commissioner to ascertain the damages sustained by the libellant by the collision between the Cole and the Tally Ho.