## THE FRED. W. CHASE.

## THE CITY OF ATLANTA.

*(District Court, D. South Carolina. 1887.)*

COLLISION—STEAMER AND VESSEL IN TOW—REV. ST. § 4233, RULE 21.

A tug boat with a schooner in tow, connected by a tow-line 300 feet long, was passing through a narrow channel during a violent and sudden gale. A steam-ship was at the same time approaching from the opposite direction. The tug and tow were moving at the rate of three miles an hour, and the steam-ship at four miles an hour. The course of the steamer was south, a little west; and the schooner was off her port bow heading north north-east, sagging north. No collision was at first anticipated, but when the steamer came within 150 feet of the schooner the relative positions of the two changed, and they approached each other almost bows on, probably by reason of the schooner sheering. The steamer, when at said distance, reversed her engines, but, notwithstanding this, struck the schooner, which became a total loss. The steamer was uninjured. Neither the tug-boat nor the schooner took any action to escape the collision, but kept on their course until it happened. *Held,* that as the steam-ship did not stop and reverse in sufficient time, as required by rule 21, and offered no evidence to explain why she did not observe the rule, she is presumed to be in fault. *Held, also,* that the tug and tow were in law one vessel, a steamer, governed by the same rule 21, and that as they kept their course, and did not explain why they did so, they are also in fault, and the loss should be divided.

In Admiralty.

*I. N. Nathans,* for libelant.

*Smythe & Lee* and *Brawley & Barnwell,* for respondents.

SIMONTON, J. This is a case of collision occurring on the bar of Charleston. The testimony is voluminous. The arguments of counsel have been exhaustive and instructing. The main facts are these:

The Fred. W. Chase, a three-masted schooner, laden with rock for the jetties, had been at anchor for several days outside of the bar. The steam-tug Monarch was engaged to tow her in, and for this purpose went along-side of her on fourth of February last. On that day the tide was high about a quarter past 3 o'clock. But the pilot, observing signs of a gale brewing in the north-east, determined to anticipate the tide and to go at once into port. Anchor was weighed about 2 o'clock, and the tug, with her tow, entered the South channel. This South channel runs from the ocean into the harbor from south to north. It is about seven-eighths of a mile in length. Near its sea entrance on the western edge is a black buoy, and on the eastern side a red buoy. At the inner end of the channel on the eastern side is a little red buoy. In the channel itself, about 300 feet from the little red buoy, west a little south of it, is a buoy marking an old wreck, an obstruction, known in this case as the wreck buoy. It has such shape and color as to indicate that there is passage on each side of it, and is about 100 feet south of the wreck it marks. This buoy, being about 150 feet from the inner entrance of the channel, divides this entrance. To the east of it is a passage, as we have seen, 300 feet wide. On the west of it the passage is about 1,200 feet wide. The most direct and straight route to the ocean in this channel is to go to the east of this wreck buoy. The pilots generally use it when they report soundings on the bar; the report always, or nearly always, refers to the east side of the channel. Steam-ships and other vessels of large draught have gone out and have come in on the west side of the channel, entering the harbor west of the wreck buoy. The Merrimac came in this way on the day of and not long before the collision. The course down the western side of this channel going to sea, near the ocean, bends towards the south-east. When the wind is easterly, ships prefer the east or weather-side of the channel.

The tug and her tow took the east side. Soon after entering the bar they encountered a gale which came up suddenly and with great violence from the north-east. In the teeth of this gale, heading north north-east, but sagging nearly due north, they proceeded at the rate of three miles an hour, and were near to the inner exit of the channel. At that time the tug was a little to the south and east of the little red buoy, not far from it, and the tow was following in her wake, lying in a south-westerly direction from her, the tow-line being 300 feet in length, passing over her starboard bow. The schooner was 140 feet long. In the mean time the City of Atlanta, a propeller, 1,680 tons burden, a passenger steamer between New York, Charleston, and Fernandina, had left her dock on that day on her voyage to New York. She had been detained a day or two by fogs. When she left the wharf the day was fine. On reaching the jetty buoy a cloud was seen in the north-east, supposed to be a fog-bank, gathering. When she reached the bell-buoy, near the entrance of the Pumpkin Hill channel, the gale struck her with full force. The steamer is 240 feet long and —— feet high out of water. The testimony of all the witnesses on both sides, who have spoken to the question, is that the master of the steam-ship, Capt. R. W. Lockwood, is a navigator of the first rank, and an excellent pilot on the Charleston bar, with long experience. He was and is of the opinion that when the gale struck him he could not return to the city, nor stop and anchor his vessel, without incurring almost certain risk of

shipwreck. In this his opinion is corroborated by the experience of the Delaware on the same day and in the same gale. He could not go out by the Pumpkin Hill channel because there was not depth of water sufficient for him. He saw no alternative but to keep his course and go out as he had started to go, by the South channel. The tug and her tow were then in sight in that channel.

Proceeding with this heavy gale behind her, the City of Atlanta approached the entrance of the South channel just at the time the tug and tow were in the position described above. Necessarily, as the schooner trailed southwesterly behind the tug with her long tow-line, she obstructed the channel in great measure on its east entrance. Although the master of the Atlanta had sounded the western side of the channel, he had never used it in entering or in leaving port. With this gale on his port quarter he did not think it safe for him to go to leeward, or to encounter the hazard of breakers on his lee; especially as in the course down this side of the channel and over one of its shoals he would be compelled to change direction to the south-east, and expose his broadside to the gale. He was in charge of a passenger ship. The lives of his passengers and crew, as well as his ship, were in his care. He was bound to use every precaution. He acted under circumstances present to him. The evidence shows that he was a man of skill and experience. If there were room for doubt on the subject, I would not hesitate in believing that, in pursuing his course towards the South channel, and in refusing to go down the western side of that channel, he was jusified by his surroundings. *The Star of Hope*, 9 Wall. 230.

No other safe course being left to her, the City of Atlanta determined to enter the east side of the channel and to pass the tug and tow. Entering the channel she saluted the tug. The steam-ship was moving slowly, about four miles an hour. When she got abreast of the wreck buoy, she put her helm hard aport. Her course was south a little, very little west. The schooner was off her port bow, heading north north-east, sagging north. When the steam-ship got about 150 feet from her, the relative direction of the two vessels was changed, and they approached each other almost bows on. The City of Atlanta at once reversed her engines. Before she had little if any sternway on her, the vessels came together, the stem of the steamer striking the schooner between the bowsprit and the cat-head, about four and a half or five feet from the former, and cut her down to the water's edge. The tow hawser parted. The bow of the schooner was knocked to the eastward. The steamship backed a little, passed across the bow of the schooner, and went to sea. The schooner dropped anchor. The tug came at once to her assistance, passed her lines and pulled on her, the anchor being then raised. All efforts were futile. The tug, with the revenue cutter, which had come promptly to her assistance, was dragged to leeward with the schooner. The tow hawser parted, the schooner drifted on the breakers of the bar and became a total loss. The steam-ship received no injury.

The first question which meets us in the case is, was the collision a necessary result of the entrance of the steam-ship into the channel east of the wreck buoy? When the steam-ship had begun her entrance into the channel, she and the tug saluted each other. Neither Capt. Holburn, master of the tug, who has followed the business of towing for years, nor Mr. Slawson, a pilot, passenger on the tug, nor Capt. Lockwood, of the City of Atlanta, his mate, nor Mr. Lesesne, at the wheel; nor the pilot on the schooner, nor the master of the schooner, every one of whom was at his proper post on the alert, then anticipated a collision. This conclusion of experienced men on the spot, and at the time, seems

to demonstrate that the collision was not the necessary result of the attempt of the steam-ship to go into this side of the channel. She had the right to use the channel, observing the rule of the road. *The Java*, 14 Wall. 198. That there was risk of collision goes without saying. A heavy gale, a narrow channel, a large schooner in tow of a propeller tug, tossing and pitching in shallow water on the bar, a long tow-line, the sea breaking over the steam-ship, the fact of the collision itself, (*The Carroll*, 8 Wall. 302,)—all of these show that the risk of collision was imminent.

Section 4233 of the Revised Statutes prescribes, as rules of the road, sailing regulations for preventing collisions, and makes them imperative. These rules apply, notwithstanding the existence of the gale. *The David Dows*, 16 Fed. Rep. 154. The twenty-first rule is in these words: "Every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." In the present case, in approaching a tug incumbered with a tow, extra precaution and care were necessary. *The Alleghany*, 9 Wall. 522; Mars. Coll. 378.

Let us examine the facts immediately connected with the collision. The steam-ship, entering the channel when she got abreast of the wreck buoy, put her helm hard aport, and moved slowly. She was then nearly opposite the tug; her head was pointed south,—a little west, says her master, a little east says the master of the schooner. She was steering on a line passing through the mizzen rigging of the schooner. The latter was off her port bow, nearly if not due south of her. The head of the schooner was pointed north north-east. Had she been moving in that direction, and had nothing happened, probably the steam-ship would have avoided her, and have passed under her stern. But she was not moving north north-east. She was sagging north, and was thus approaching the steam-ship at the rate of three miles an hour. The steamer went at four miles an hour. When they were within 150 feet of each other they suddenly and unexpectedly came together nearly bows on. There is much conflict of opinion in the testimony as to the cause of this. The master, pilot, mate, and helmsman of the schooner swear that she did not sheer, but kept her course. The master and the mate of the steam-ship, and Mr. Lesesne, at the wheel, swear that she did sheer to port. The tug-master and the pilot, passenger on the tug, did not see the schooner sheer. There is room for an honest mistake on this point. Persons on a moving body or on a stationary body near a moving body, especially at sea, cannot distinguish their own motion from that of the other body. The schooner was towed by a propeller with a long tow-line. The sea was very high. The tug pitched a great deal. Every time she pitched her propeller got out of water and her speed was checked. The gale was in her teeth. As her speed was checked the tow line would slacken. It passed over the starboard bow of the schooner. The gale was on that bow. All vessels in tow everywhere are apt to sheer. The conditions existing necessitated the sheer, and the sheer to port. On theory, it is most probable that the schooner did sheer. But

this does not solve the question. This sheer was to be expected, and should have been guarded against. It was occasioned by natural causes, existing at the time, and patent. It was one of the reasons for adopting the precautions required by law,—one of the things which "made the approach involve risk of collision." *The Franz Sigel*, 14 Blatchf. 480; *Fretz* v. *Bull*, 12 How. 466. Now, when the steam-ship was abreast of the wreck buoy, opposite the tug, and with the schooner's mizzen in the line of her course, nearly south, she was at the right angle of a triangle, the tug being at one angle, and the tow at the other, the hypothenuse of which was the length of the tow-line and the distance on the schooner to her mizzen, say $300+100=400$ feet. As the steam-ship was on the perpendicular line, she was distant from the schooner less than 400 feet, and the combined motion of schooner and steam-ship was seven miles an hour; that is to say, she was less than half a minute from the schooner. Her helm was hard aport. She moved slowly, but she did not reverse or stop, rather attempt to stop, until she was within 150 feet,—too late to avoid her; certainly too late to avoid the effect of the sheer. *The America*, 92 U. S. 432.

The rule required her not only to slacken speed, but to stop and reverse. This being so, the omission to adopt some of the precautions presented by the rule being shown, the burden of proof is shifted to the steam-ship; and, unless she proves circumstances rebutting the presumption, she will be held in fault without proof of any specific act of negligence on her part. Mars. Coll. 31; quoting *The Carroll*, 8 Wall. 302; *The Scotia*, 14 Wall. 170; *New York U. S. Mail Co.* v. *Rumball*, 21 How. 372. Every one on the steam-ship was at his post, vigilant, observing, alive to the emergency. Whether the apparent course of the schooner, N. N. E., but really north, deceived them, or whether other reasons prevented them from observing the letter of rule 21, the testimony does not disclose. Failing to explain this fact, to show circumstances rebutting the presumption, she cannot be said to be without fault.

We have next to examine into the conduct of the tug and her tow. What was their relative duty to the steam-ship? In *New York & Baltimore Transp. Co.* v. *Philadelphia & S. Nav. Co.*, 22 How. 472, it was contended that a tug with a tow was to be treated in the same way as a sailing vessel by an approaching steamer, and that the steamer must keep out of her way. Mr. Justice CLIFFORD repudiates this proposition: "No authority was cited in support of the proposition, and we are not aware of any decided case that favors this view of the law." In *The Alleghany*, 9 Wall., quoted above, the fact that a tug was incumbered with a tow was deemed proper cause for great care on the part of the steamer approaching them. In *The Civilta*, 103 U. S. 701, the court says: "The ship and the tug were in law one vessel, and that a vessel under steam." In *The L. P. Dayton*, 120 U. S. 350, 7 Sup. Ct. Rep. 568, the court says: "As against the Bowen," the colliding steamer, "the movement and navigation of the tow was under the control and management of the Dayton," her tug, "and in a suit against the Bowen the latter can have no other or greater rights, and no other or better standing in court,

than would the Dayton have had in case the collision had been directly with her; because the tow in such a suit is identified with its own tug, so far, at least, that she cannot escape the consequences, if the collision was caused wholly or in part by the fault of the tug," quoting *The Civilta, supra; Sturgis v. Boyer,* 24 How. 110; *The J. H. Gautier,* 5 Ben. 469; *The Cleadon,* Lush, 158.

The circuit and district decisions are on the same line. *The U. S. Grant,* 7 Ben. 195, and *The Favorite,* 9 Fed. Rep. 709, in a collision between sailing vessel and tug and tow, held the latter responsible as a steamer. In *The Clifton,* 14 Fed. Rep. 586, and in *The Pennsylvania,* 3 Ben. 215, the collisions were between steamers and tugs with tow. The latter were held to the obligations of a steamer. So, also, in *The Mary Shaw,* 6 Fed. Rep. 918, a case decided by Judge MORRIS in this circuit, and strikingly like this in many features, the same obligation for steamer was required of a tug and tow meeting a steam-ship.

The facts in this case are within the reason given for the oneness of the tug and tow,—that the motive power is in the one, and the control in the other. Mars. Coll. 189. The sails of the schooner were not only furled, but they had their sail-covers on. In reply to a question in that connection, "And you trusted entirely to the motive power of the tug-boat?" The master of the schooner answered: "Yes; we only wanted to get in." At the same time the pilot in charge, who, as the master said, controlled him, and on whom the evidence shows he placed all the responsibility of acting when the collision became apparent, (page 15 of the testimony,) the pilot was on the schooner. This being so, the tug and tow "being in law one vessel, and that a vessel under steam," what was their duty, and what did they do?

The twenty-first rule surely applied to them: "Every steam-vessel approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." This prescribed their duty. Both the master of the tug and the master of the schooner clearly and positively swear that they kept on their course. There is no reason to believe that they did anything at all but keep on as they were. The master of the tug was evidently under the impression that he had nothing to do; that he was nothing but a spectator, interested, in a sense, but not responsible in any sense. This being so, and it being evident that rule 21 was not observed, it is incumbent upon the tug and tow to explain why it was not observed. Nothing in the evidence discloses the reason for this non-observance. They must be subjected to the same rule which has been applied to the steam-ship. Both parties being not free from fault, the loss will be divided. *The America,* 92 U. S. 432.

The schooner cost to build $33,000. She was built in August, 1882. She perished February, 1887, and was four and a half years old. No repairs of any consequence were put on her. The depreciation in the value of vessels is at the rate of 8 per cent. per annum. Applying this rule, the schooner was worth, when lost, $24,765. The net freight was $500. The instruments, etc., were worth $800. Total loss, $26,085.