### THE ALLEGHANY.

A steam vessel entering a short, narrow, and artificial channel, in some
parts shoal, such as the "Straight Cut" at Milwaukee in which it is
liable to meet tugs coming from the other end with tows, is bound to
exercise caution as to the way it enters and proceeds, and to have and
keep itself, both as to course and rate and speed, entirely under control

APPEAL from the Circuit Court for the District of Wis
consin.

The owners of the schooner Winslow libelled the pro-
peller Alleghany in the District Court for Wisconsin, to re-
cover compensation for a collision by which the schooner
had been greatly injured and sunk. The catastrophe oc-
curred on a mild morning of May, when there was no wind,
and nothing to obstruct the vision of those who had charge
of the propeller, in what is known as the "Straight Cut" at
Milwaukee, a sort of canal which makes the harbor entrance
from the Milwaukee River to Lake Michigan, and of which
an idea will perhaps be conveyed by a diagram on page 523.

Although the testimony was in some particulars very con-
flicting, the controlling facts were either admitted in the
answer, or were satisfactorily proved.

The cut is eleven hundred and fifty feet in length, and
about two hundred and sixty feet in width between its piers.
Its course is from east to west, and it enters the river nearly
at right angles. At its west end, though between the piers,
there is a bar extending inward from the north pier toward
the middle of the cut, and, of course, reducing the depth of
the water. The schooner had left her dock in the river, and
she was proceeding out through the cut into the lake, in tow
of the steamtug Muir, and about twenty-five feet astern of
the tug. Shortly after leaving the dock the propeller was
seen entering the eastern end of the cut from the lake, and
the tug signalled to her by one whistle to keep to the star-
board or north side. To this signal the propeller responded
by a similar signal, thus announcing an intention to pass the
tug and the schooner on their port side. A second signal

to the same effect was given by the tug when the vessels
were nearer each other, but to this no answer was returned.

The collision took place shortly after, soon after the tug had
entered the cut, when she was still headed toward the south
pier, and before she had been able to straighten out her tow.
The exact place of the collision was not certainly established,
but it was clearly south of the middle of the cut, and not far
from its western entrance.  Its effect was to break in the
bow of the schooner, and sink her in fifteen minutes.  The
propeller entered the cut at a high rate of speed.  She had
been racing on the lake to reach the entrance in advance of
another vessel, and, according to the answer made to the
libel, she was running eight miles an hour when she entered.
She did not shut off her steam at all until within half her
length of the piers, and then only partially.  Her steam was

not entirely shut off until she had proceeded a considerable distance within the cut. She steered wildly, not obeying her helm. Her speed was too great for proper steering in shallow water, considering her draught. She kept on, however, in the middle, between the piers, instead of stopping or moving to the north side of the cut, as she had signified her intention to move by her answer to the tug's signal.

The District Court decreed against the propeller, and on appeal the Circuit Court did the same.

Her owners now appealed to this court.

*No argument was made at the bar for the appellants; but their counsel had leave to file a brief.   Mr. Emmons, for the other side.*

Mr. Justice STRONG, having stated the case much as above, delivered the opinion of the court.

If the facts of the case, about which there is little, if any dispute, be considered, there is no difficulty in determining where the fault of the collision rests. The tug, though a steamer, was incumbered with a tow. She was, therefore, not as manageable as the propeller. She could not back, or even stop, without danger of collision with the schooner. It was necessary in entering the cut from the river that both the tug and her tow should cross the bow of the propeller heading toward the south pier; and as the cut entered the river at nearly right angles, it was also necessary for her to increase her speed at the entrance in order to bring the schooner into line and prevent her running against the south pier. The course of both the tug and the schooner required to be changed not less than ninety degrees within a distance not much exceeding two hundred feet. All this was known to the master of the propeller. His steamer was entering the harbor. It was, of course, his duty to move with great caution. He knew that the entrance was narrow and difficult, especially if other vessels were to be passed. He knew that near the west end of the cut the water on the north side was shoal, and he knew how much water the propeller needed. He knew also that at the west end a tug passing

out to the lake, with a tow in charge, must change her course to the east, and keep up her speed in order to straighten out the tow.    What, then, was his duty ?   Apprised, as he was in season, of the approach of the tug and schooner, and planning, as the answer to the libel avers he did, to meet them, not in the river, but between the harbor piers, it was, obviously his duty to avoid the meeting in that part of the cut where the propeller could not go to the north side, and to make no attempt to pass until the tug could straighten out her tow.   He had it in his power to select the place for passing.   If it be, as is now contended, that the propeller could not at that part of the cut go nearer the north pier, in consequence of the bar, she was not the less in fault.   She ought not to have been there.   She ought to have foreseen the difficulty and guarded against it.   And this fault was closely connected with another.   The propeller entered the cut at too great a rate of speed.   This increased the danger.   It brought her to the place of greatest difficulty at the most unfavorable time for passing it, besides making her unmanageable.   It is true her engines were reversed when she was in close proximity to the schooner, but not soon enough to stop her forward movement before she reached the most dangerous point in the channel, not soon enough to prevent her running into the schooner before she could be straightened out for her course through the cut.   It is thus manifest that the collision was caused by the misconduct of those in charge of the propeller.

We do not perceive that the tug was at all in fault.   It was not in her power to stop without either colliding with the schooner or permitting the schooner to run upon the south pier.   At the time of the collision both the tug and the schooner were on the south side of the channel, where they had a right to be.

DECREE AFFIRMED WITH INTEREST AND COSTS