## THE CHARLOTTE.

### BOSTON TOWBOAT CO. *v.* THE CHARLOTTE.

*(District Court, D. Maryland.* May 30, 1892.)

1. **COLLISION—TUG AND TOW—SPEED OF STEAMER.**
   Upon the facts found by the court, the steamer Charlotte *held* solely in fault for a collision with a large coal barge, towed by a tug alongside, in the bend of the Brewerton channel at the entrance into the cut-off channel of the Patapsco river. *Held,* that the speed of the Charlotte, at 14 miles an hour, was too great, in meeting a tug incumbered with a heavy tow in a turn of a channel.

2. **SAME—SHEER OF STEAMER.**
   *Held,* that the testimony indicates that the Charlotte in making the turn took a sheer towards the barge, which her high speed made it impossible to overcome in time to avoid the collision.

3. **SAME—TOWING BARGE.**
   *Held,* that the method of towing the barge by placing the tug alongside on her quarter was proper.

4. **SAME—SKILLFULNESS OF MASTER—PILOT'S LICENSE.**
   *Held,* that the master of the tug was competent for the duties he was performing, and that the fact that he did not have a pilot's license for the Chesapeake bay was immaterial.

*(Syllabus by the Court.)*

In Admiralty. Cross libels for collision.
*Robert H. Smith,* for libelant.
*John H. Thomas & Son,* for respondent.

MORRIS, District Judge. These are cross libels arising from a collision in the Patapsco river on the morning of April 24, 1892, between the iron coal barge Lone Star, in tow of the steam tug Mercury, and the steamer Charlotte. The collision was just at the turn from the Brewerton into the cut-off channel, near black buoy 19. The barge was 281 feet long and 38 feet beam, loaded with 2,811 tons of coal, and drawing $18\frac{1}{2}$ feet of water. She had the tug alongside on her starboard quarter, and was making not over four miles an hour. She was bound out on a voyage from Baltimore to New York. The Charlotte is a propeller 240 feet long, and was on her regular trip from York river to Baltimore, drawing $12\frac{1}{2}$ feet of water, and making, until she slowed before the collision, from 14 to 15 miles an hour. The bow of the Charlotte struck the port quarter of the barge about 40 feet from the stern, tearing off one of her iron plates, and cutting into her so that she soon sank. The damage to the Charlotte was slight. The master of the tug was on board the barge, and the master of the barge was in charge of the navigation, and they were both either in or just outside the barge's pilothouse, which is 40 feet from her bow. The weather was fine, the morning clear, and at the time of the collision it was broad daylight. The libel, on behalf of the barge and tug, states that they were going down the Brewerton channel about half past 7 in the morning, approaching the bend at the lower end, where it connects with the cut-off channel, when

the Charlotte was seen coming up the cut-off channel; that the Charlotte gave a signal of one whistle, to which the tug promptly answered; that at once the helms of the barge and tug were put to port, and then hard aport, and the barge and tug went slowly to starboard, changing their headway from a point and a half to two points, and bringing them on a course parallel with the line of buoys on the southwest side of the entrance to the cut-off channel; that the order was then given to steady, in order to keep the barge in the channel as her depth required, and leaving ample room on her port side for the Charlotte to pass; that the Charlotte, after giving her signal of one whistle, came on rapidly, and, after passing the barge's bow safely, so changed her course to port that she struck the barge on her port quarter, and cut her to the water's edge, so that she sank.

The faults charged against the Charlotte are (1) neglect to port upon giving signal; (2) neglect to slow down sooner; (3) crowding over towards the barge when the steamer was light, and did not require the deep water of the channel; (4) changing her course so as to run into the barge; (5) neglecting to port her wheel sufficiently to clear the barge at a safe distance.

The libel on behalf of the Charlotte alleges that after 7 o'clock, when she was on her proper course in the cut-off channel, and about opposite Seven-Foot Knoll lighthouse, she saw over her port bow the tug and the barge coming down the Brewerton channel a considerable distance off; that when the Charlotte got near to black buoy 15, in the cut-off channel, and the barge and tug were more than a mile off, she blew one whistle, to which the tug promptly answered with one whistle; that when the Charlotte got to black buoy 17 she starboarded half a point to the westward, and when she got to buoy 19 she entered the Brewerton channel, and went to the northern and eastern side of it, and headed three quarters of a point northerly of its course; that, when she had steadied on that course, she saw that the stern of the barge was on the northern and eastern side of the channel, and was still swinging in that direction, so as not to leave room for the Charlotte to pass; that the Charlotte, as soon as it was seen that there would not be room to pass, ported and slowed, and almost immediately afterwards her helm was put hard aport, and her engines full speed astern; that the barge and tug approached with unabated speed, their sterns swinging still more to the eastward and northward, and struck the Charlotte with great violence; that the Charlotte's engines had been reversed for about three minutes, and she had almost stopped.

. The faults charged against the barge and tug are (1) that they were too far over on the north side of the Brewerton channel; (2) that the barge should have been towed astern of the tug, and not alongside, so as not to occupy so much of the channel; (3) that the barge and tug were across the Brewerton channel instead of parallel with it; (4) that the master of the tug had no proper license to act as master, and was not familiar with the channel.

*The Place of Collision.* An essential fact to be ascertained, if possible, is the place of collision. The witnesses who were in charge of the navigation of the barge and tug say that, after they had changed their course to starboard and steadied, they then had the black buoy about 4 points off the tug's starboard bow, and 25 or 30 yards from the tug's bow, which was 75 feet abaft the barge's bow, and that after the collision the tug passed not over 15 feet from the black buoy. As the course of the barge and tug was steered entirely by the buoys which mark the channel, and as the black buoy 19 is the first of the black buoys which mark the western edge of the entrance to the cut-off channel where it diverges from the Brewerton, and was the only guide they had by which to change their course, and which they would naturally aim to pass as close as they safely could, it seems highly probable that those in charge of the navigation of the barge and tug watched it, and, as they were to steer by it, noticed it accurately; and, as I see no reason to distrust them, I take their testimony as fixing the place of collision at a point where the barge had the black buoy 19 abreast her bow on her starboard side, and about 50 feet distant.

*The Course of the Barge and Tug.* An important fact, also, is the heading of the barge and tug at the moment of collision. It would appear from the witnesses on behalf of barge and tug that near buoy 18 the barge's wheel was put aport, and then hard aport, and then steadied to make the turn into the cut-off channel; and that, after passing buoy 18, they got the signal from the Charlotte, indicating her intention to pass port to port, and then the wheels of both barge and tug were put hard aport to change their course more rapidly, and when they were on a line with the entrance of the cut-off channel, and with the black buoys marking that line, they steadied. The distance between buoy 18 and buoy 19 is about a third of a mile,—1,760 feet,—and there can be no doubt but that the barge and tug had ample time in which to properly change their course a point and three quarters, which was all that was necessary to change from the Brewerton channel to the line of the three black buoys which mark the entrance into the cut-off channel.

The contention on behalf of the Charlotte is not that the barge failed to change her course to the southward in obedience to the interchange of signals, but that she changed it too rapidly, so that her head came around to southward, and her stern swung across the channel, and obstructed it; the deep channel being 400 feet wide, and the barge 280 feet long. This contention, I do not think, is supported either by the proof or the probabilities of the case. The witnesses on the Charlotte, as well as those on the barge and tug, say that, when the signals were exchanged, the barge and tug were somewhere near buoy 18. The barge at once began to shape her course to pass the Charlotte port to port. She had ample time and space in which to do it. The master of the barge was anxious not to make the turn so suddenly as to head the barge too much to the southward of the channel and run on the southward bank. The course of the barge and tug at the moment of collision was a fact which,

by observing the black buoys, those on the barge and tug could tell to a certainty; whereas with those on the Charlotte the barge's course is a matter of inference and supposition. The witnesses from on board the barge and tug all appeared to be unusually intelligent, clear, and fair in giving their testimony, and I observed nothing to cause me to distrust them. They testify that before the collision they had got on their proper course, and were proceeding with the wheels of both barge and tug steadied amidship, which certainly they would not have been doing if the barge's stern was swinging over to port, and her bow to starboard, as is contended on behalf of the Charlotte, for they would then have been in apprehension of the immediate danger of going aground on the southerly side of the channel.

The testimony of the mate of the Charlotte tends to confirm the barge's contention that she was not lying across the Brewerton channel at the moment of collision. He states that the Charlotte's course at that moment was N. W. by W., that is to say, only three quarters of a point more northerly than the Brewerton channel, and he says:

"I did not hardly expect, when we passed her bow, that there would be a collision. * * * We were nearly parallel with each other. If she had been wood, we would have mashed by her, but her iron caught in our bow. * * * It was a glancing blow. * * * I noticed the barge commenced to haul to starboard when she was a little over a mile off, and she did change a little, but her speed would not let her change much."

I find as a fact that at the moment of collision, and just before it, the barge and tug were heading southeast in a line with the black buoys of the cut-off channel, and at an angle of one and three-quarters points to the course of the Brewerton channel. The width of the Brewerton channel at right angles across is 400 feet, but, measured on the line of the black buoys, it is 560 feet from black buoy 19 on the southern edge to the center of the channel. The length of the barge is 280 feet, so that with her bow abreast of buoy 19, and her direction as I have found it to have been, her stern could not have projected beyond the center line of the Brewerton channel.

*Conclusions with Regard to the Barge and Tug.* The sole neglect which can be alleged against the barge is that her stern occupied the water to the north and east of the center line of the Brewerton channel, so as to obstruct the Charlotte's passage. This is improbable, in view of the fact that the vessels exchanged signals when a mile apart, and it is nearly impossible if the testimony of those on the barge and tug are believed when they say that immediately upon answering the Charlotte's signal, they ported. The barge was proceeding slowly, and porting was what the master knew he had to do both to turn into the cut-off channel and to pass the Charlotte. He had plenty of time and plenty of space in which to do it. He had the buoys to guide him. He had the master of the tug in or near the pilothouse of the barge to watch the Charlotte and give orders to the tug. He knew he had to proceed carefully, and not run out of the channel on account of the draft of the barge. He was

a competent man, of long experience in navigation, and had been in charge of this barge for 5 years, and had made 25 or 30 trips to Baltimore in her. He was familiar with the turn in the channel, and was giving his undivided attention to her navigation. When he saw that the Charlotte was going to strike his stern, he at once put his wheel hard astarboard, which is conceded to have been the right thing to do to ease the blow, and is an indication of his coolness and skill.

It is contended that some presumption of fault against the tug is to be drawn from the fact that her master did not have a pilot's license for the Chesapeake bay and its tributaries, but, in fact, it was the master of the barge who was in charge of the navigation of both vessels. The tug merely furnished the motive power, and the master of the barge, as the man of greater experience and more familiar with channels and the steering of the barge, had charge. The master of the tug was properly placed to see that orders to the wheelsman of the tug were obeyed. There is nothing whatever to show that the master of the tug did not faithfully and skillfully perform all the duties required of him. Under such facts, it was held in *The Blue Jacket*, 144 U. S. 371, 12 Sup. Ct. Rep. 711, that his not having a license was immaterial.

It is contended that the tug was improperly placed alongside the barge, and should have been ahead, and towed the barge on a hawser. The testimony does not so convince me. On the contrary, I think it is shown by nearly all the expert witnesses produced by both sides that there ought to be no difficulty in an able tug, such as the Mercury, towing the barge alongside, and many of them state that it is the most prudent method of towing in narrow channels.

It is not contended that the tug should have stopped and reversed. She was making only four miles an hour, and could not have slackened without losing steerage way and control of the barge. Stopping would have increased the risk of collision.

On the whole evidence, I find that the barge and tug were not in fault.

*Faults Chargeable against the Charlotte.* The Charlotte is a propeller 240 feet in length, making usually 14 to 15 miles an hour, and drawing 12½ feet. She ran her usual course and at her usual speed up the middle of the cut-off channel. It is hardly possible to reconcile the statements of her master and mate and wheelsman as to just when the changes in her course were made. The mate's statement is that before he reached buoy 15 he signaled, and ran his course up the center of the cut-off channel until he got to buoy 17; then he began gradually to make a circle to port to enter the Brewerton channel. He says they were going to port all the time by degrees from the time they entered the Brewerton channel until they steadied before the collision. He also says that, when abreast of buoy 17, he slowed the steamer, and when he got up parallel with the northern edge of the Brewerton channel, and about 30 or 40 feet from it, he steadied, and, finding he was going to be pinched for room, he reversed full speed astern, and put his wheel hard aport, and ran so for nearly three minutes before the collision. That when

they collided the red buoy 18 was, if anything, on his port bow. To another interrogatory he says that when he reversed the red buoy was a little on the port bow, and when they collided it was about half a point on the starboard. In answer to other questions, he says he ran N. W. by N. ½ N., which was the course of the cut-off channel proper, until he got to within 30 or 40 feet of northern edge of the Brewerton channel, before he starboarded, and he then let her go to get into the Brewerton channel; that then he steadied, and then, when he was 500 to 600 feet from the barge, he reversed full speed astern, and put his helm hard aport.

There are several things about these statements which excite surprise. First, that he should run his northerly course up to within 30 or 40 feet of the northern edge of the Brewerton channel, and then, by starboarding his helm, be able to make a change of three points without going beyond the edge of the channel; next, that when he had steadied on his new course in the channel he should have had red buoy 18 a little on his port bow, and after reversing, which would throw the Charlotte's bow to starboard, and putting his wheel hard aport, which would also put her bow to starboard, he could have run three minutes and three lengths of the steamer, and then have buoy 18 half a point on his starboard. This is the more surprising when it is considered that all along the northern edge of the channel at that place there is more than 15 feet of water outside the dredged channel, and the Charlotte only drew 12½ feet. He denies that the steamer took any sheer to port, and says she was only 15 feet from the northern edge of the channel at the time of collision. The master of the Charlotte, who came into the pilothouse just before the signals were exchanged, says that at buoy 17 the mate began a gradual circle to port to get into the Brewerton channel; that, when they entered the Brewerton channel about abreast of buoy 19, he said to the mate that the barge had taken a sheer, but a little while afterwards the barge seemed to mind her port wheel, and then the mate said, "I better slack her down," and in 20 seconds afterwards the mate stopped and backed the Charlotte, and they were backing three minutes before the collision, the barge being 1,000 feet off when they reversed. The master contends that the vessels collided midway between the buoys 18 and 19, and that the barge was to the northward of the center of the channel, and at an angle of about two points with it. The master admits that a few seconds after the collision he saw black buoy 19 a little on the starboard bow of the barge. The wheelsman of the Charlotte states that when they were opposite to buoy 17 the mate slowed the steamer, and said "Aport," and in about half a minute he said "Hard aport," and backed her full speed for three minutes; that the barge and tug were then just about the neck of the cut-off across the channel, nearest the northern and eastern side, and at the time of collision the Charlotte was only 15 feet from that side of the channel.

This account given by the Charlotte's witnesses does not seem consistent, intelligible, or satisfactory. They practically admit that when the

Charlotte was reversed the barge and tug were in the Brewerton just entering the neck of the cut-off channel, and was porting her wheel and coming to starboard. They claim that they had reversed long enough to stop the Charlotte's headway, and yet claim that when they collided the barge's stern was still up within 20 or 30 feet of the northern edge of the channel. They claim that she was on a course two points off from the north side of the channel, and going four miles an hour, which would be over 333 feet a minute, and yet she never got away from it. They claim that the Charlotte's wheel was hard aport for three minutes, and yet her bow never went to starboard.

I do not mean to impute to the Charlotte's witnesses anything but this: that, believing they were not in fault for the collision, they have formed a theory about it which they cannot reconcile with the facts. They are men of experience and character, and have the presumption in their favor which arises from their constantly traversing these channels at high speed without collisions; but in this instance I do not think the explanation of the disaster is to be found in the theory their testimony is supposed to support. It is quite evident that they met the barge and tug just as they were making the turn into the cut-off channel,—a most difficult place. It is evident that until just before the collision they were running at their full speed of 14 to 15 miles an hour, and were circling to port towards the barge and tug. It is evident that not until they got into the Brewerton channel, having made a turn of fully three points, did they apprehend difficulty, and it is quite probable that they then still had a sheer to port. It is, indeed, almost certain that they had this sheer when they have to admit that a hard aport helm and reversed propeller did not counteract it. Their whole case depends on the assertion that at the time of collision they were within 15 or 20 feet of the north bank of the Brewerton channel. It must be borne in mind that there is nothing there to mark that bank. There is a depth of more than 15 feet beyond it. The red buoy 18 next above, which marks the line of the channel, was a third of a mile distant, and red buoy 16 as far in the opposite direction. They admit they were never in a line with these buoys, so that their statements about their proximity to the north side of the channel are inferences, with no ascertained fact by which their accuracy can be tested. These inferences are based principally, I am disposed to think, upon their finding the barge in a place more northerly than they expected to find her, she not having made as much progress into the cut-off channel as they had calculated she would by the time they reached the neck of the junction, or by the Charlotte having come around to port a trifle more rapidly than they expected. It is quite evident that the Charlotte, when she gave the passing signal, did not port her wheel at all, but kept her usual course up the center of the cut-off channel. It is evident that, although she saw she was approaching a tug incumbered by a heavy tow in a bend of the channel, she did not slacken her high rate of speed until in the very jaws of danger. As was said by the supreme court in *The Alleghany*, 9 Wall. 522: "The

propeller entered the cut at too great speed. This increased the danger. It brought her to the place of greatest difficulty at the most unfavorable time for passing it, besides making her unmanageable." In my judgment the Charlotte is solely to blame for this collision.