TOWBOAT NO. 1, NORFOLK & WESTERN.

THE BERKSHIRE.

MERCHANTS' & MINERS' TRANSP. CO. v. NORFOLK & W. R. CO.

(Circuit Court of Appeals, First Circuit. June 23, 1896.)

Nos. 160, 161.

1. COLLISION IN CHANNEL—STEAMER WITH TOW—EXCESSIVE SPEED.
    A steamer of over 2,000 registered tonnage, descending the narrow channel of the Providence river at between 10 and 11 knots an hour, and colliding with a barge in tow of a tug, *held* in fault (1) for moving too fast in the narrow channel, with vessels about, and a tow of about 650 feet approaching; and (2) for violating Rev. St. § 4233, rule 21, which required her, under such circumstances, to at least "slacken her speed," which she did not do until about a minute before collision. The Josephine B., 7 C. C. A. 495, 58 Fed. 813, approved.

**2.** COLLISION—EVIDENCE.

Evidence of witnesses on board a tug and tow that they actually shortened the tow line from 600 to 300 feet before entering a river must prevail over the mere estimates of lookers-on as to the length of the line.

**3.** SAME—TOWING IN CHANNEL—LENGTH OF HAWSER—USAGES OF NAVIGATION.

It is beyond the province of the courts to condemn a usage of navigation, such as towing on hawsers of about 50 fathoms in narrow channels, so notorious and long-continued that it must be presumed to be known to congress and to the supervising inspectors, and yet has not been condemned by either. The Josephine B., 7 C. C. A. 495, 58 Fed. 813, approved.

**4.** SAME.

When vessels approach each other in channels, especially narrow ones, each pilot is bound, with peculiar exceptions, to keep well over to the side on his starboard hand; and this rule is not affected by the fact that the bends in the channel may at times bring one of them on the starboard hand of the other.

Appeals from the District Court of the United States for the District of Rhode Island.

Eugene P. Carver and Edward E. Blodgett, for appellants.

Wm. G. Roelker, for appellees.

Before COLT and PUTNAM, Circuit Judges, and NELSON, District Judge.

PUTNAM, Circuit Judge. This collision occurred August 16, 1893, in the early afternoon, in the narrow channel of the Providence river at Sabin's Point, between the steamer Berkshire, descending the river, and a barge in tow of a tug, ascending the river, the tug being known as N. & W. 1, and the tow as Barge N. & W. 4. The barge was loaded with coal, and was sunk. The channel was largely a dredged one, and off Sabin's Point was 500 or 600 feet wide, but above there only 300 or 400 feet. Ascending the river, that part of the channel with which this case is concerned bore northerly —north, three-fourths west—below Sabin's Point, and above it still northerly, but with a trend of quite four points easterly. To the easterly of the channel, at and near Sabin's Point, was a sheet of shallow water, so the approaching vessels concerned were seasonably and continuously visible for a sufficient time for safety of movement on the part of each of them.

There are two libels, one in behalf of the Berkshire against the tug, and one against the Berkshire. That against the Berkshire is joint in behalf of the owners of the barge and of the cargo aboard. The proofs in the district court were taken by depositions. It is therefore claimed by the Berkshire that the decision of the learned judge of that court does not have so much weight as if he had seen the witnesses. The Berkshire was 2,014 tons register, and the barge was of 1,063.69 tons, and was loaded with 1,716 tons of coal. The Berkshire drew 14 feet 6 inches forward and 11 feet 10 inches aft. She was equipped with a right-hand propeller, and always, at full speed astern, backed a-port, no matter how the wheel was put. Her full speed was 11½ knots. The barge drew 18 feet 6 inches. The entire length of the tow, on the theory of the Berkshire, was as follows: Tug, 135 feet; barge, 210 feet; hawser, 600 feet,—total, 945 feet. On the theory of the tug it was as fol-

lows: Tug, 135 feet; barge, 210 feet; hawser, 300 feet,—total, 645 feet. There are two appeals, and each taken in behalf of the Berkshire. In the case on the libel filed by the owners of the Berkshire the assignment of errors alleges two faults only, namely: (1) A narrow channel, with an unjustifiably long tow line. (2) The tug and tow were across the narrow channel, so as to block it. The first was the only fault alleged in the libel filed by the owners of the Berkshire. On the libel against the Berkshire the assignment is the same as the other, adding also: (3) The barge was in fault in not proceeding right behind the tug. (4) The barge was in fault in not putting her helm to the starboard sooner. The record, however, does not require us to give these special attention.

The libel in behalf of the Berkshire alleges that the Berkshire passed the towboat, "keeping it on the starboard," but it does not state how she came to have the tug on her starboard, nor where the tug was when first sighted. The answer to the libel against the Berkshire says she discovered the tug, with the barge in tow, "on the starboard side of the channel, and on her starboard bow"; that the tug was heading towards the western side of the channel; that the Berkshire put her helm to starboard, and soon after reversed; that she had come to a stand at the time of the collision, and that the tug was proceeding about six miles an hour; and it charges against the tug faults as in the assignment of errors referred to. The master of the Berkshire testifies that she was running through the water about eight knots when he first saw the tug; that this was about five minutes before the collision; that the Berkshire was then right in the middle of the channel; that he could not go to starboard, as the tug was across the channel; that he gave an order to starboard, and afterwards hard a-starboard and full speed astern; that these last orders were a little over a minute before the collision; that he had not before this given any order to slow or reverse; and that the collision was on the eastern side of the channel,—and he admits an ebb tide of two or three knots. This makes the Berkshire's speed over the ground, by her own admission, between 10 and 11 knots. He further testifies that if he had "stopped" or "backed" he would have thrown his ship "out of her course." He does not state specifically whether he could have slowed. He says, in the same connection, the steamer Petrel was coming up behind him, but he does not know how far astern. The following occurs on his cross-examination:

"Q. When you first saw her, you have marked upon the chart, she was clear across the channel? A. I came around Pomham, and saw the tug, and then came the Bay Queen. She gave me one whistle, and I answered it, and I ported. Then I looked at the tug, and thought to myself, the tug is going to make a turn, and then I just kept to the eastward. Q. You saw that she was not going to make a turn? A. I saw there was no room for me to pass. A tug going around a point like that has got to proceed some distance in order to get her tow round. Q. You saw that this tug had a long hawser when you first noticed her, you say? A. Yes, sir. Q. Then the longer the hawser, the longer the distance she would have to go over to the westward before she could turn up stream again in order to make her

barge clear the Sabin's Point light, judging from your observation? A. She would have to swing over that way. Q. You knew that she would have to swing over that way. Then why didn't you slow down until she got past? A. I thought there was room enough to go to the eastward. Q. Then, if you hadn't thought there was room enough to go to the eastward, you would have slowed down? A. Yes, sir. Q. When did you first find out that you could not get by her? A. When I got up to Sabin's. Q. Do you mean that you were a quarter of a mile off at the time? A. A quarter of a mile, when I found that I could not get by."

Fairly construed, this means that he could have slowed down, and also that the tug had not in fact crossed to the westward, but merely that he thought she was going to do so. The Berkshire was plainly in fault in two particulars: She was moving too fast in that narrow channel, with many vessels about, and this tug with her long tow approaching; and Rev. St. § 4233, rule 21, required her at least to "slacken her speed" under the circumstances, which she did not do seasonably. In The Josephine B., 7 C. C. A. 495, 58 Fed. 813, the circuit court of appeals for the Second circuit held a steamer in fault under circumstances which, in all essential particulars, were singularly like those of the Berkshire.

We will next consider the alleged faults of the tug. In her answer to the libel in behalf of the Berkshire the tug says she was coming up on the east side of the channel; that the Berkshire was first sighted on the west side or middle of the channel; that after the collision the Berkshire passed astern of the barge, and on her west side, up the channel to Providence, showing that there was room enough for the Berkshire to have passed out on that side. The allegations of her libel are substantially the same. We have referred to the only fault alleged against her in the Berkshire's libel, which was in the following language:

"That the said collision and damage was due to and caused by the carelessness and bad management of the said tug in towing said barge with a long hawser through the narrow channel, instead of being lashed alongside said barge, or of using a short hawser for towing."

The faults alleged in her answer to the libel in behalf of the tug, which answer was filed somewhat later than the libel against the tug, are as follows:

"(1) In proceeding up a narrow channel with such a long tow line. (2) In proceeding across a narrow channel in such a way as to block the channel, when they should have kept right up the channel. (3) In the barge not proceeding directly after the tugboat. (4) In the barge not putting her helm to starboard. (5) In not keeping clear of the said steamship Berkshire, as required by law,—and other faults to be shown at the trial of said cause."

The tug alleges and offers proof that she gave a signal of one whistle, and got no reply. It may be that she was, therefore, in fault, under the supervising inspectors' rule 3, approved February 19, 1892, and having the force of law (Belden v. Chase, 150 U. S. 674, 698, 14 Sup. Ct. 264; The Delaware, 161 U. S. 459, 467, 16 Sup. Ct. 516), for not promptly giving the danger signal and stopping, which she could perhaps have done without danger to her tow, as

she was running against the tide (The Galatea, 92 U. S. 439, 446). But neither the pleadings nor the assignments of error raise this question, so we cannot, with justice, give it consideration. The same is true as to the proposition urged upon us that the tug should have stopped, because she was heading against the current, although this rule was especially applied to like circumstances in The Talabot, 15 Prob. Div. 194, a well-considered case, which, availing here, would perhaps hold that the tug, before making the turn, was bound to wait for the Berkshire to pass, and this independently of any local usage. It is to be noticed that neither the Berkshire's libel nor her answer directly charges as a fault the mere matter of towing on a hawser, but only its length. This has relation to her proofs that it was about 100 fathoms long. On the other hand, the tug claims that it was of a length customary in such inland waters, and in that very locality; that is, about 50 fathoms. Baker, the master of the tug, testifies in detail and directly that, before entering the river, and while off Bristol, the hawser was shortened from its sea-towing length to 50 fathoms. The other witnesses aboard the tug and barge confirm this. Evidence of witnesses who took actual part in this act must prevail over the mere estimates of lookers-on. The Berkshire produces many opinions that the make-up of the tow in this respect was faulty, but it is mainly based on the hypothesis of a hawser 100 fathoms in length. Independently of this, it is beyond the province of the courts to condemn a practice so notorious and so long-continued that it must be presumed to be known to congress and to the supervising inspectors, and yet has not been condemned by either of them. We must regard the usages of navigation (The Galatea, 92 U. S. 439, 446), and we do not know that we would be authorized to condemn as unsafe the use of this narrow channel by a tug with its tow, on a hawser of customary length, more than by a propeller so large and of such draft and speed as the Berkshire, whose master admits that she backed a-port, as already stated, and could not safely stop and reverse, all which means that she was in danger of "smelling" the ground, and failing to answer her helm (The Ralph Creyke, 6 Asp. (N. S.) 19; Mars. Mar. Coll. [3d Ed.] 515). On the whole, we adopt the language of the circuit court of appeals in The Josephine B., 7 C. C. A. 495, 58 Fed. 813, 816, a case we have already cited. One question there was as to the fault of a tug in taking a tow through Hell Gate on a line of 250 feet. The court said:

"Such a method of navigation seems unwise; but not only is there evidence that it is quite common, when a tug has a single large schooner in tow, but some of the experts testify that such is the safer course, and that the other method would render control of the tug more precarious, while not increasing materially her control of the tow. We concur with the district judge in the conclusion that the conflict between the experts is so great that, in the absence of any special regulations on the subject, the party holding the affirmative of the question has not shown towing on a hawser to be a fault, by a fair preponderance of proof."

Spooner, the master of the steamer Bay Queen, testifies in behalf of the Berkshire, as follows:

"**Q.** That afternoon, when you were going up towards Providence, were you ahead or astern of this tug and barge? **A.** Ahead of her. **Q.** Did you see the tow line which connected the two? **A.** Yes, sir; I seen it. **Q.** What was the length of it? **A.** I should think it was over two hundred feet. **Q.** How is the channel in that place where this collision took place? **A.** It is a very bad and narrow place to get a steamer round, or a tow especially. I think it is the worst place we have there in the bay. **Q.** When, therefore, you say that the tug and tow took up the whole channel, you don't know actually whether they did so or not? **A.** I know that with that length of tow line they could not get round the point without taking up the whole channel. It takes up the whole channel when they come up there with a long line. I have seen lots of them before."

If, therefore, the contingencies were as stated by this witness, we can only determine that we cannot condemn the tug merely because the tow was made up as it was, and that the pilot of the Berkshire was bound, when he sighted the tug and tow, to foresee the possibility of difficulties, and to immediately take the degree of precaution necessary when, either on land or at sea, vehicles or vessels are approaching to pass each other under extraordinary circumstances. The Alleghany, 9 Wall. 522, and The Syracuse, Id. 672, apply directly to circumstances like these at bar. We cite again The Galatea, at page 446:

"Beyond doubt, the navigation through that Gate is quite dangerous; and yet the evidence tends pretty strongly to show that both vessels, if proper precautions had been used, might have passed each other in safety, and without danger of collision."

Aside from this, did the tug head to cross to the western bank of the channel, as claimed by the Berkshire? It must be admitted that, especially in a channel so narrow, each pilot was bound, with peculiar exceptions not applicable here, to keep well over to the side on his starboard hand; and the fact that the bends in the channel might at times bring one on the starboard of the other does not affect this rule. The John S. Hasbrouck, 93 U. S. 405, 407; The Galatea, 92 U. S. 439, 442; Mars. Mar. Coll. (3d Ed.) 344, 427, 466, 468, 513; The Velocity, 3 P. C. 44; The Ranger and The Cologne, 4 P. C. 519. This rule is recognized as sound by article 21 of the international regulations of 1885. It must also be said that, even if, on account of the state of the pleadings and of the issues actually tried in the district court, the special rules to which we have referred as prima facie governing the tug are not directly in question here, the narrowness of the river, coupled with the bend, demanded of the tow, made up as this was, very great precaution, and prohibited it from lying across the channel, when it might have stopped as required in The Talabot, ubi supra, and The Galatea, ubi supra, until the Berkshire had gone clear. Therefore, as she did not take the special precautions referred to, we must hold the tug in fault, if it be shown she did not keep herself and her tow to the easterly side of the center of the channel. Hooper, the master of the Berkshire, testifies that, as he was passing the steamer Bay Queen, shortly before the collision, the tug was about crossing his bow; that the tug was steering "northeast, or north-northeast," and the barge "about north." These courses agree with those given by the tug. He

says "he had taken up the whole of the channel." This probably means the tug and tow. Keine, the Berkshire's quartermaster, sustains her master, and says that, when he got the first order to starboard, the tug was on his starboard bow, and the barge on his port bow; but he says he "gave no particular attention." Our attention has not been called to the evidence of any other person aboard the Berkshire whose duty it was to maintain a lookout. Miller, a witness for the Berkshire, a deckhand aboard the Petrel, 22 years old, said "the barge" "had it all,"—meaning the whole channel. An examination of his testimony shows it of no value. The same as to Nevil, ashore, waiting to go clamming, who used about the same expression. Cornwell, another witness for the Berkshire, also waiting to go clam-digging, testifies that the barge and tug were well on the east side of the channel at the time of the collision, and again that the tug was heading in a "northwest" direction, which would bring her partly across the channel. His testimony weighs on the whole for the tug, but it is of little value. Our attention is not called to any other proofs in favor of the Berkshire on this point. On the other hand, we find in the Berkshire's own case the following: First, her earliest statement of the case, which is in her libel, complains only of the length of the tow line, and makes no complaint that the tug and tow had in fact taken the channel; second, Capt. Hooper's cross-examination, already referred to, shows rather an apprehension that the tug would cross the channel than the fact that she had done so. On the other hand, Capt. Baker, of the tug, testifies positively that the tug and barge kept well on the easterly side of the channel. Capt. Burnett, of the barge, testifies the same. These witnesses appear fair, and are not weakened on cross-examination. Many other witnesses are to the same effect. The Berkshire makes a point that the Berkshire was at all times on the starboard bow of the tug. This is admitted by Baker and Burnett. From the nature of the bend in the river, this would be so until the tug was well around it. It is plain from the admitted place of collision that the tug had not fully accomplished the turn when it occurred. For the same reason, the tug had not got on a course of several points to the eastward of north, but was on one of only about one point to the eastward, when the collision occurred, as is claimed by the Berkshire and admitted by the tug. As the tug and tow were making the bend, the barge would inevitably head a little more northerly than the tug. Therefore we see nothing in these facts to affect the general aspect of the case, for reasons already given as applicable to bends in narrow channels. On the whole, the Berkshire fails to maintain the burden of proving that either the tug or her tow was on the westerly side of the channel, or in fault as put in issue.

In No. 160, the Steam Towboat No. 1, the decree of the district court is affirmed, with the costs of this court for the appellees.

In No. 161, The Berkshire, the decree of the district court is affirmed, with interest, with the costs of this court for the appellees.