## NESTOR v. JOSEPH.

### In re CHICAGO SCRAP IRON CO.

(Circuit Court of Appeals, Seventh Circuit. February 11, 1920. Rehearing Denied March 11, 1920.)

No. 2652.

Bankruptcy ☞165(2)—Retention of money from proceeds of joint enterprise not preferential payment.

Evidence *held* to sustain defendant's contention that an arrangement by which he advanced money to bankrupt with which to buy scrap iron, to be sold to a rolling mill company of which defendant was president, was a joint enterprise, the profits and losses of which were shared equally between bankrupt and defendant, and under which the retention by defendant of proceeds of sales did not constitute preferential payment of a debt.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by Arthur Nestor, trustee in bankruptcy of the Chicago Scrap Iron Company, bankrupt, against Israel Joseph. Decree for complainant, and defendant appeals. Reversed.

Thomas J. Lawless, of Chicago, Ill., for appellant.
Herman Frank, of Chicago, Ill., for appellee.

Before BAKER, EVANS, and PAGE, Circuit Judges.

EVANS, Circuit Judge. Appellee recovered judgment for the amount of an alleged preference paid within four months of the date of the adjudication in bankruptcy. No question of insolvency, date of payment, or appellant's knowledge of the bankrupt's financial condition at the time of payment is in issue. Appellant contends, however, that he had a right to retain the money received, because it was the proceeds of a joint adventure of said bankrupt and appellant.

Briefly related, the evidence showed that appellant, the president of the Joliet Rolling Mill Company, a corporation engaged in handling scrap iron, was also engaged in the same business, as was also the bankrupt. Appellant and the bankrupt in May, 1911, entered into an agreement which is described in the report of the master as follows:

"The evidence taken on this hearing shows that in May, 1911, the defendant Israel Joseph was president of Joliet Rolling Mill Company. The bankrupt was at the same time in the scrap iron business in Chicago. The bankrupt and the defendant entered into an agreement by which the bankrupt should sell scrap iron to the Joliet Rolling Mill Company. The bankrupt did not have sufficient capital to buy the scrap iron, and the bankrupt and defendant entered into an agreement by which the defendant was to furnish the money to pay for the scrap iron and share equally in the profits and losses. In pursuance of this agreement bankrupt sold to the Joliet Rolling Mill Company, from May to October, 1911, inclusive, a large quantity of scrap iron, on 30 to 60 days' time. In all these sales the bankrupt drew time drafts on defendant at the time he shipped the scrap iron to the purchaser for the amount for

which the scrap iron was sold, defendant took notes from the bankrupt for the amount of the draft, the bankrupt discounted the drafts at the bank, and they were accepted by the defendant and paid at maturity. The bankrupt de- livered to defendant duplicate invoices of the shipments to the rolling mill. When it sold the iron, and the Joliet Rolling Mill Company paid bankrupt for the shipment, the bankrupt in turn paid defendant the amount advanced, and afterwards accounted to him for his share of the profits."

The only transactions in dispute were those covering the last nine carload shipments. On October 31, 1911, apparently alarmed over bankrupt's financial condition, appellant procured from the Joliet Rolling Mill Company checks for the payment for these shipments, secured bankrupt's indorsement, and cashed them. On November 4th creditors of the bankrupt filed their petition in bankruptcy and an ad- judication followed. The master, in disposing of the issues, further reported:

"In re Kessler, 74 Fed. 906 (Judge Holt, N. Y. Dist.), is referred to by de- fendant's counsel. That was a joint adventure, the purchase of certain bonds and stocks on joint account, although the capital was advanced by one. In the case at bar there was no purchase of anything as a joint purchase. It was the individual purchase by the bankrupt with money advanced by the defend- ant. The property was to be immediately sold to the Joliet Company, but the title to it was to remain in the bankrupt in the interim. After the sale to the Joliet Company, and after he had received the pay, the bankrupt was to repay the defendant, and also to remit him one-half the profit or commission. I fail to see that there was a partnership, such as discussed in the case re- ferred to, or that it was such a deal as changes the designation as that of debt- or and creditor."

The determining question is therefore one of fact; for, if a joint adventure is disclosed by the testimony, appellant's right to retain the money cannot be successfully assailed. Bankruptcy Act 1898, § 5h (Comp. St. § 9589); Francis v. McNeal, 228 U. S. 695, 33 Sup. Ct. 701, 57 L. Ed. 1029, L. R. A. 1915E, 706; Mills v. Fisher & Co., 159 Fed. 897, 87 C. C. A. 77, 16 L. R. A. (N. S.) 656; In re Kessler & Co. (D. C.) 174 Fed. 906.

There is little or no conflict in the testimony. Appellee contends that the testimony of appellant on a prior hearing was quite different from his testimony given before the master. We have carefully ex- amined the evidence given on both occasions, and are unable to find any material discrepancy between the two statements. On his first exami- nation, when no question as to his right to retain this money was in volved, appellant described his relations with the bankrupt as follows:

"Q. And the relation between you and the Chicago Scrap Iron Company is that of debtor and creditor, wasn't it? They owed you the money? A. Well, I don't know whether you might call it debtor and creditor. You might call it agent. They bought this stuff, and I paid for it. I was to get this money from the Joliet Rolling Mill Company, and they were to pay me this money. You understand my position. My business with them was of two kinds. I buy from them direct, and if I buy from them direct, why I would accept a draft and then pay the draft. And then again I said: 'Why, now, you go and sell the Joliet Rolling Mill Company ten or fifteen thousand dollars worth,' and he would say to me, 'where is the money coming from?' and I would say, 'All right, I will pay it,' and he sent his goods to the Joliet Rolling Mill Company and would draw on me for that amount, and I being an officer of the Joliet Rolling Mill Company, whenever the amount was due, would take these

checks, and bring them in to Broad, and he would indorse and pay me the money I had advanced."

On the same hearing, when the relations were again gone into, he said:

"My transactions with the Chicago Scrap Iron Company were two kinds; one kind where they sell the stuff to me, and one kind where they sell to the Joliet Rolling Mill Company and I pay these bills. Not when they matured, but when they were sent to me, and the Chicago Scrap Iron Company, they draw on me drafts for the amount they send to the Joliet Rolling Mills Company, and give me a note for it. In other words, this particular transaction is on this draft here. * * * This draft was made out on October 24th, and I paid it on that day, and it is marked stamped 'Paid' on October 24th. Here is the note," etc.

On the second hearing the same witness went further into the details of the arrangement between himself and the bankrupt, the substance of which is accurately set forth in that part of the master's report first quoted. There was also received in evidence the drafts, the bills to the Joliet Rolling Mill Company, also a statement of each shipment, a copy of which the bankrupt sent appellant, from which it appeared that appellant was charged with certain losses and credited with certain profits.

Certain letters, written at a time when there was no possibility of litigation, strongly confirmed appellant's story. For example, as early as July 21, 1911, appellant wrote the bankrupt:

"Please advise if you received check from the Joliet Rolling Mills Company for your invoice of June 16, amounting to $569.91. * * * The writer will probably be over to see you to-morrow about noon."

Again, on July 31st, the bankrupt wrote:

"Get after the Joliet Rolling Mills Company to give you check for your invoice of June 16th, for $569.91; also for your invoice of June 27. * * *
    "Yours very truly."

On the same day, July 31, 1911, he wrote a second letter:

"Inclosed please find our check for $536.50 in payment for your bill No. 687 * * * for material shipped to Joliet Rolling Mills *for our joint account.*"

In this last letter we find a descriptive characterization of the undertaking made at a time when there was no possible motive for describing that relation in any other than its true character. Appellee relies chiefly, if not solely, upon the execution and delivery of notes by the bankrupt at the time the drafts and the invoices were presented to appellant; it being claimed that the notes conclusively established the relation of debtor and creditor between bankrupt and appellant. It is significant, however, that none of these notes drew interest, that none of them were returned when appellant received the checks from the Joliet Rolling Mill Company, that all of them were presented by appellant at the hearing, and by him explained to be memorandums showing the advancement of money. That these notes, some of them large, should have been retained by appellant long after the transactions evidenced by them were closed, is unusual. If, how-

ever, they were but memorandums, and not evidence of indebtedness, as appellant asserts, their retention by the payee therein named is more readily explained.

Counsel for appellee insists that this evidence or memorandum of payments was unnecessary, because appellant's own books showed the transaction. But obviously appellant's books would not have the same weight or effect as the admissions of the bankrupt. While the drafts drawn by the bankrupt would perhaps, when paid, be proof of an advancement, yet evidence aliunde would be necessary to explain the transaction. While the making, delivery, and acceptance of the notes constitute an embarrassing fact from appellant's standpoint, it is, we think, overcome by the oral evidence, supported as it is by the various bills, statements, and letters, concerning which there is no dispute.

The decree is reversed, with directions to dismiss the bill.