WALTER G. HOUGLAND, INC., et al.,
Libelants,

v.

THE M/V CARPORT and THE BARGE G-1, their engines, etc., and Cargo Carriers, Incorporated, Respondents.

CARGO CARRIERS, INCORPORATED,
Libelant,

v.

Kenneth L. HUTTON, d/b/a Hutton Marine Service, Respondent.

Nos. 582, 588.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

June 5, 1961.

Lemle & Kelleher, George B. Matthews, Thomas H. Leach, New Orleans, La., for Walter G. Hougland, Inc.

Terriberry, Rault, Carroll, Martinez & Yancey, Andrew T. Martinez, Edward S. Bagley, New Orleans, La., for Cargo Carriers, Inc.

Taylor Porter, Brooks, Fuller & Phillips, Tom F. Phillips, Baton Rouge, La., for Kenneth L. Hutton and underwriters.

J. SKELLY WRIGHT, District Judge.

Shortly after nightfall on November 12, 1958, in the Mississippi River at Baton Rouge, the M/V Whayne H brought the head of her tow [1] into collision with integrated Barge G–1 and M/V Carport [2] while the latter vessels were at anchor. The owners of the Whayne H and her tow have libeled the M/V Carport, the Barge G–1, and their owner, Cargo Carriers, Inc. Cargo Carriers, in addition to cross libeling, has brought a separate proceeding against Kenneth L. Hutton and his underwriters, alleging that Hutton had contracted to care for the Barge G–1 and M/V Carport, including the placement thereon of proper anchor lights, and had failed to do so, thereby contributing to the collision.

██ At the time of the collision, Kenneth Hutton was doing business as Hutton Marine Service. His place of business was a house boat moored to the east bank of the river in the harbor of Baton Rouge. He operated some tugs engaged in general harbor work and fleeting in and around the port of Baton Rouge, Louisiana. The integrated Barge G–1 and M/V Carport had on a previous occasion been in the Hutton fleet which was maintained in several places along the banks of the river. However, at the time in suit the river was at low tide and, because of the draft of the Carport, the Barge G–1 and M/V Carport had been anchored out in the river some 500 feet off the east bank [3] in front of Hutton Marine Service. Anchored some 300 feet west of the integrated tow were at least two ocean going vessels, and a third was anchored approximately a thousand feet south. Although at the time in suit the area in question was not officially designated as an anchorage, it was customary for vessels to anchor there. All the anchored vessels, other than the Barge G–1 and the M/V Carport, [4] were properly lighted at the time of the collision, whereas it appears that the integrated tow was showing only one dim lantern on the

1. The Whayne H was pushing in tandem the libelant Barges WGH–10 and WGH–12, both light. The M/V Whayne H is a steel hull, diesel powered, twin screw pushboat, with two General Motors engines of 1400 horsepower total, measuring 112 feet in length, 26 feet in breadth, with a draft of 8 feet. The vessel has a raised pilothouse forward, is pilothouse controlled, and is equipped with radar. The WGH–10 is a steel semi-integrated barge, 278 feet in length, 50 feet in width, and 11 feet in depth. The WGH–12 is a semi-integrated oil barge, 265 feet in length, 50 feet in width, and 11 feet in depth.

2. The M/V Carport is a steel hull, diesel powered tug, 63.7 feet in length, 27.6 feet in breadth, and 7.6 feet in depth. The Barge G–1 is a steel hull barge, 287.9 feet in length, 43.6 feet in breadth, and 18.7 feet in depth. The M/V Carport and the Barge G–1 were constructed for use as a unit tow. The stern of the barge was slotted to permit the bow of the Carport to fit into it.

3. The Mississippi River at Baton Rouge is straight and approximately one-half mile wide.

4. Barge G–1 and M/V Carport, being an integrated tow, should be considered as one vessel for lighting and liability. Cargo Carriers v. Snyder, D.C., 104 F.Supp. 258, affirmed United States v. Humphrey, 93 U.S.App.D.C. 45, 206 F.2d 488. Western Rivers Rule 13(b), 33 U.S.C.A. § 322(b), applicable here, reads as follows:

"A vessel of one hundred and fifty feet or upward in length, when at anchor, and not moored to the bank or a wharf, shall carry in the forward part of the vessel, where it can best be seen, one such light, and at or near the stern of the vessel, and at such a height that it shall not be less than fifteen feet lower than the forward light, another such light."

mainmast on top of the house of the Carport.

The downbound M/V Whayne H and tow arrived at the upper limits of the port of Baton Rouge just about dark. As she passed under the highway bridge located at Mile 233 AHP, she observed the group of ships at anchor in the vicinity of Mile 229 AHP. She was proceeding at full speed making approximately 10 to 11 MPH over the bottom. Her master, Captain Backus, was at the wheel and her pilot, Worley, was off duty but in the pilothouse talking to the captain. The Whayne H had no lookout and the only deck hand on duty was in the galley cleaning coffee pots.

The Whayne H continued with engines full ahead in approximately mid-river. By this time the night was dark but visibility was good and there was little or no wind. The current was negligible. There was no traffic in the channel of the river, which favored the west side. Nevertheless, the Whayne H decided to favor the east side of the river, first altering her course to port and then steadying on a heading parallel to and about 400 to 500 feet off the east bank. Shortly after steadying on this heading, and with engines still full ahead, the lead barge of the Whayne H flotilla struck the Barge G–1 in a head-on collision. Those aboard the Whayne H did not see the G–1 or the Carport prior to collision. After the collision, the Whayne H tied off her tow and came alongside the Barge G–1. The personnel of the Whayne H then noted the dim kerosene lantern on the mainmast of the Carport. They also noted that a Hutton tug came alongside the Carport, removed the dim lantern from her mainmast, and replaced it with a bright lantern. The Hutton employees also removed an unlighted lantern from the foremast of the Barge G–1 and replaced it with a brightly lighted lantern.

The Whayne H maintains that the sole cause of the collision was her inability to see the Barge G–1 and the M/V Carport because of the improper anchor lights, while the owners of the Carport, Hutton and his insurer all maintain that the sole cause of the collision was the speed of the Whayne H tow through an anchorage without keeping a proper lookout.

Although there has been a modest effort on the part of Cargo Carriers and Hutton to prove that the integrated tow was properly lighted at anchor, the effort was doomed to failure because Hutton had to admit that it was his practice to change the anchor lights of the Barge G–1 and the M/V Carport daily at about 5:00 P.M. On November 12, 1958, this was not done. Apparently Hutton and his men were otherwise engaged and simply failed to provide the required change. Of course, there was much testimony to the effect that the lanterns were good for 36 hours and that it was not necessary to change them every 24, but the fact remains that at the time of the collision the one light on the Barge G–1 was out and the other on the Carport was in the process of going out. Even if both had been brightly lighted, there would still be statutory fault on the part of the integrated tow because, under Western Rivers Rule 13(b), the forward anchor light must be 15 feet above the aft one. Here, if anything, the aft one on the Carport was higher.

■ The fault on the part of the Barge G–1 and the Carport is so obvious that it need not be labored. Before the integrated tow can get the benefit of presumptions reserved for anchored vessels, it must be shown that she was properly lighted.[5] Not only have her owners failed in undertaking this burden, but the affirmative proof shows that these vessels, because of the condition of their anchor lights, were a menace to navigation in the middle of the harbor of Baton Rouge.

5. American Dredging Co. v. Calmar S.S. Corp., D.C.E.D.Pa., 121 F.Supp. 255, affirmed per curiam 3 Cir., 218 F.2d 823; Middlesex Quarry Co. v. Schooner Albert Mason, D.C.S.D.N.Y., 2 F. 821; Bruce v. Debuse Barras Company, D.C. E.D.La., 169 F.Supp. 90.

■ With the fault of the G–1 and the Carport so obvious, it is, of course, not necessary narrowly to scrutinize the conduct of the Whayne H in an effort to find fault on her part. Where the conduct of one vessel provides ample cause for a collision, minor fault on the part of the other may be ignored.[6] But here the fault of the Whayne H cannot be ignored. The Whayne H, as the moving vessel, labors under the presumption of fault.[7] She has failed to dispel this presumption.[8] In fact, irrespective of presumption, the admitted actions of the Whayne H are sufficient to condemn her. She proceeded full speed into collision in the crowded harbor[9] of Baton Rouge, outside the navigation channel, and very probably through a recognized anchorage.[10] Moreover, there was only one man on duty above deck, the helmsman, and he was almost 600 feet from the head of his tow.[11] While it is true that a lookout is not required under all circumstances on the head of a tow,[12] nor is it clearly established that a lookout anywhere, in addition to the helmsman,[13] is an absolute necessity under all conditions, yet here unquestionably a lookout could have helped.[14] A lookout on the head of the tow undoubtedly would have disclosed the presence of the Barge G–1 and the Carport in time to avoid the collision. It is true that the integrated tow was dimly lit, but lit she was. And this fact would have been disclosed by a proper lookout. Under the circumstances, the fault of the Whayne H requires the division of damages.

■ Hutton's insurer denies coverage for the collision in suit on the ground that the service being rendered by Hutton to the Carport and Barge G–1 was not part of his "Barge Fleeting operations,"[15] which is the pertinent language of the policy outlining its coverage. The insurer maintains that Hutton's fleet was maintained alongside the bank and that a vessel anchored in the stream by Hutton could not be considered part of the fleet. As indicated, the G–1 and the Carport would have been alongside the bank with the rest of the Hutton fleet but for the low tide of the river and the draft of the Carport. Moreover, location, under the policy, has nothing to do with the coverage. The policy specifically states that it covers accidents occurring "anywhere in the world."[16] The real question presented is whether or

---

6. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; Compania de Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120; Koch-Ellis Marine Contractors v. Chemical Barge Lines, 5 Cir., 224 F.2d 115.

7. The Oregon, supra, 158 U.S. 197, 15 S. Ct. 809; Coyle Lines v. United States, 5 Cir., 195 F.2d 737.

8. See Bruce v. Debuse Barras Company, supra, 169 F.Supp. 92–93, and cases there cited for a discussion of the effect of the presumption.

9. The Syracuse, 9 Wall. 672, 76 U.S. 672, 19 L.Ed. 783; The Alleghany, 9 Wall. 522, 76 U.S. 522, 19 L.Ed. 781; The Ditmar Koel, 5 Cir., 65 F.2d 555; The George H. Jones, 2 Cir., 27 F.2d 665.

10. Culbertson v. The Southern Belle, 18 How. 584, 59 U.S. 584, 15 L.Ed. 493; Old Time Molasses Co. v. United States, 5 Cir., 31 F.2d 963, 965.

11. Compare Smith v. Bacon, 5 Cir., 194 F.2d 203; G. B. Zigler Co. v. Barker Barge Line, 5 Cir., 167 F.2d 676.

12. Parker Bros. & Company v. DeForest, 5 Cir., 221 F.2d 377.

13. But see The William A. Jamison, 2 Cir., 241 F. 950, 952; Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603, 605.

14. Smith v. Bacon, supra; G. B. Zigler Co. v. Barker Barge Line, supra; Parker Bros. & Company v. DeForest, supra.

15. The policy provision reads:
"This insurance is to cover the Assured's Legal Liability arising out of their Barge Fleeting operations for loss or damage to the property of third parties * * *"

16. The policy provision reads:
"This policy applies only to occurrences or accidents happening during the policy period anywhere in the world, provided the claims are made or the suits are instituted within the United States of America."

not Hutton was providing fleeting service to the G–1 and the Carport at the time in question. About that there can be no serious doubt. Probably the reason Hutton chose to anchor the G–1 and the Carport while providing these services, rather than nesting them with the other vessels in the fleet, was the provision in his insurance policy expressly excluding coverage for damage "resulting from the grounding of any vessel while moored and in the Assured's custody."

Decree accordingly.